Argued January 13, affirmed January 20, 1925.

## STATE *v.* ARTHUR COVELL.

(232 Pac. 628.)

**Criminal Law—Corpus Delicti in Murder Prosecution Held Sufficiently Proved to Admit Confession.**

1. *Corpus delicti* in murder prosecution was sufficiently proved to admit defendant's confession, where it was shown that victim was dead and under circumstances that clearly indicated that a criminal homicide had been committed in producing her death.

**Homicide—Failure to Denounce Proposed Crime Held not to Make One an Accomplice.**

2. Failure of one to whom defendant confided his intention to murder another to firmly and diligently act in denouncing proposed crime did not make her an accomplice.

**Criminal Law—Technical Admissibility of Confession not Affected by Defendant's Statement That It was False.**

3. Defendant's claim that confession of murder voluntarily made was false, and made in order to save his nephew, was a matter to be considered by jury with all the other circumstances, but did not go to technical admissibility of confession.

**Criminal Law—Doctor's Testimony Held Competent, Though Testifying He had Formed No Opinion as to What Caused Decedent's Death.**

4. Though doctor had testified that he had formed no opinion as to what caused decedent's death, it was competent to show by him as an expert that conditions were such that it might have been caused by suffocation, and that ammonia or other chemicals would have produced such condition, when followed by testimony that ammonia actually was used.

---

1. See 13 R. C. L. 736; 1 R. C. L. 576.
2. See 13 R. C. L. 727.
3. See 1 R. C. L. 584.
4. See 13 R. C. L. 911.

**Homicide—Question Asked Husband of Decedent if He had not Requested Police Protection Held Irrelevant.**

5. In murder prosecution, question asked husband of decedent, who was arrested on suspicion of being concerned in murder but who was later discharged, whether he had not asked police protection when proposing to walk in public after murder, was irrelevant.

**Homicide—"Malice" Presumed Where Homicide Intentional, Unlawful and Deliberate.**

6. Where a homicide is shown to have been intentional, unlawful and deliberate, law will conclusively presume "malice," which is an intent to injure another, to be established either by proof or by presumption of law.

**Homicide—Malice Presumed Where Murder was Premeditated, Without Justification, and Deliberate.**

7. Where a murder was planned for many days before it was consummated, and was without justification, and was intentional and deliberate, malice would be presumed.

**Homicide—Expressions of Hatred or Ill Will not Indispensable to Show Malice.**

8. In murder prosecution, expressions of hatred or ill will against deceased, or difficulties between deceased and defendant, while admissible, were not legally indispensable to show malice.

See (1) 16 C. J. 737. (2) 16 C. J. 674. (3) 16 C. J. 719. (4) 16 C. J. 753 (1926 Anno.). (5) 30 C. J. 166. (6) 29 C. J. 1091. (7) 30 C. J. 142. (8) 30 C. J. 292.

From Coos: JOHN C. KENDALL, Judge.

In Banc.

The defendant, Arthur Covell, was indicted for the crime of murder in the first degree, the indictment charging that:

"The said Arthur Covell, on the 3rd day of September, 1923, in the County of Coos and State of Oregon, then and there being, did then and there, while acting together with one Alton Covell, wrongfully, unlawfully, feloniously, purposely and of deliberate and premeditated malice kill one Ebba Covell by suffocating her, the said Ebba Covell, by means of a chemical substance commonly known as ammonia being held in the hands of one Alton Covell and applied to the nose and mouth of the said Ebba Covell,

6. See 13 R. C. L. 770.

contrary to the statutes in such cases made and provided, and against the peace and dignity of the State of Oregon.''

Alleged errors will be noticed in the opinion.

AFFIRMED.

For appellant there was a brief and oral argument by *Mr. Claud H. Giles.*

For respondent there was a brief and oral argument by *Mr. Ben S. Fisher,* District Attorney.

McBRIDE, C. J.—This case is somewhat remarkable and revolting as to the circumstances, but the questions of law raised upon the appeal are in nowise novel.

The deceased was the wife of Dr. Fred Covell, who lived a few miles out of the town of Bandon, in Coos County, Oregon, and who was a practitioner of that branch of pseudo-medicine called chiropractics, his office being in the town of Bandon. The evidence introduced by the state tended to show that Dr. Covell left his home on the third day of September, 1923, to go to his place of business, leaving at his home his brother, Arthur Covell, who at that time was a member of the family; his son by a former wife, Alton Covell; his daughter by a former wife, Lucille Covell; three children by his then wife, and his wife, the deceased person. The evidence indicated that at about 12:30 that day he was called up on the telephone from his house by the defendant and told to hurry home, as "something terrible" had happened. When he arrived there he found his wife dead. Later an examination was made by the coroner which revealed several severe bruises on different parts of her body, none of which was apparently sufficient to cause death, and a discoloration upon

her face, covering the greater portion of it, which in the opinion of experts, was caused by the application of some caustic or alkaline substance or acid, of which ammonia might have been one of the possible agents, and the proof tending to show strongly that her death had occurred from suffocation by the application of such agency to her mouth and nostrils.

The defendant in this case was so crippled as to be unable to get in or out of bed without assistance and physically incapable, himself, of having committed the crime. The husband, Dr. Covell, was arrested, but, no proof being found against him, he was subsequently released. Alton Covell, a young man of decidedly weak mind, amounting, apparently, almost to feeble-mindedness, was arrested and subsequent to his arrest made a confession, in which he admitted that he physically committed the act upon the suggestion of the defendant, who was his uncle, and who apparently had almost absolute control over him in all respects.

Lucille Covell, a stepdaughter of the deceased, was called as a witness and testified that some time before the killing her uncle, the defendant, called her into his room and told her that he and Alton, his nephew, were going to kill the deceased. She finally fixed the date of the conversation at about a month before the date of the actual killing. She testified that Arthur Covell told her several times, and told her that they were going to use ammonia as the agent to do the killing; that they finally bought the ammonia and kept it in her uncle's room, and that this was about a week or two before the killing; that the understanding was that Alton was to do the actual killing; that she was somewhat frightened but did not actually believe that they would carry the

design into execution; that she did not tell her father about it because her father was a quick-tempered man and she feared the consequences of his anger to her uncle; that her uncle told her finally that it was to be done on the 3d of September at 11 o'clock; that the relations between her uncle and the deceased did not seem to be very friendly in any way; that they were not very pleasant to each other; that on the morning of the 3d of September she got up at 7 o'clock and got the breakfast, washed the dishes, and that her stepmother was about the house; that they had breakfast at 8 o'clock, the whole family being present, except the defendant, who was bedridden; that after breakfast her father prepared to leave; that he left about 9 o'clock, in his automobile, and Mrs. Covell rode with him a short distance to the top of a hill for a ride with the younger children, as it was her custom to ride that far with him and then come back with the children; that along about 11 o'clock she, Lucille, went outside with the children; that Alton carried his uncle out under the trees, close to the house; that she kept the children outside and when her uncle was brought out she thinks she took them around to him. She then testified:

"Q. Now tell the jury what took place. A. I don't remember.

"Q. Well, did Alton go any place, or anything happen? A. Well, at 11 o'clock it was the time and so he went in.

"Q. And did Uncle Artie tell him anything? A. I think he said it was time.

"Q. What did he mean by that? A. Well, it was time to do it.

"Q. To do what? To kill her? A. Yes, sir."

Alton then went in. Lucille Covell testified that she did not remember that she saw the ammonia that

morning; that Alton was in the house about fifteen or
twenty minutes; that while he was there she heard
scuffling, but did not hear any outcry; that after this
lapse of time Alton came out to his uncle; she does
not know what he said to his uncle, but that she
went in and helped Alton put Mrs. Covell on the
bed; she does not remember that there was any con-
versation after Alton came back out; that Alton
washed Mrs. Covell's face and put her on the bed;
she thinks her uncle told him to do that; all that
she noticed when she went in was that Mrs. Covell's
face was stained, and, as far as she could tell, she
was dead; she smelled no odor of any kind; she tried
to call up her father on the telephone but could not
get him and her uncle was brought into the house and
finally got Dr. Covell on the phone and said over
the phone "something awful" had happened, and to
come quickly; after that Alton took his uncle upstairs;
her father reached home at 12:30, about one hour
later.

The defendant made and presented to the grand
jury a succinct statement, in which he admitted the
fact that the crime was committed by Alton Covell,
under his direction, by suffocating the deceased with
ammonia, entirely exonerating his brother and taking
upon himself the whole blame by alleging that Alton
was weak-minded and entirely subject to his will.
He was an astrologer by profession, if following
such study can be called a profession, and evidently
was a man of a very peculiar bent of mind generally,
although not shown to have been theretofore in any
way vicious, but, on the contrary, of rather an even
temper. His confession, taken as a whole, if suffi-
ciently corroborated to go to the jury, was amply
sufficient to show that he had deliberately planned and
caused actually to be executed by his nephew a most

atrocious murder. A question is raised as to the admissibility of the confession and whether there is sufficient corroboration of it to justify the court in submitting the case to the jury. It is first contended by able counsel for defendant that there was not, at the time this confession was admitted, any proof of the *corpus delicti;* but, as we said in the case of *State* v. *Howard,* 102 Or. 431, 439, 440 (203 Pac. 311, 314):

" * * * It follows, therefore, that in cases of this character proof of the *corpus delicti* simply involves the establishment of the fact that the person named in the indictment as the victim is actually dead and that such death was the result of the criminal act of some other person. The principle is thus stated in *State* v. *Hand,* 1 Marv. (Del.), 545 (41 Atl. 192):

" 'There must be a *corpus delicti.* That is, if a man openly confesses that he had killed another at a certain time, unless there is proof that a man was actually killed, even though the missing man may not come back, the confession amounts to nothing.'

"See, also, 16 C. J., § 1578; *People* v. *Tapia,* 131 Cal. 647 (63 Pac. 1001); *Ruloff* v. *People,* 18 N. Y. 179; *United States* v. *Williams,* 28 Fed. Cas. 626; *Pitts* v. *State,* 43 Miss. 472; *Commonwealth* v. *Webster,* 5 Cush. (Mass.) 295 (52 Am. Dec. 711)."

1, 2. It had been shown by the testimony of physicians that Ebba Covell was dead, and under circumstances that clearly indicated that a criminal homicide had been committed in producing her death. This was sufficient proof of the *corpus delicti* to admit the confession, and the objection, therefore, had no substantial ground. In addition to this, the physicians were corroborated, substantially, by the testimony of Lucille Covell, and there is little or no testimony indicating that she was an accomplice, although the court submitted that matter to the jury. She appears to have been a child of about fourteen years

of age, very backward, and hardly normal; and there is no testimony that, either by advice or act, she contributed to the commission of the crime. She admits that the defendant and Alton told her what they intended to do and that she was horrified at the idea, and admits that she failed to make the criminal design known to her father for the reason we have heretofore stated. But there is not one particle of testimony that she aided, abetted or assisted in any way in the commission of the crime, and her failure firmly and diligently to act in denouncing the proposed crime does not make her an accomplice. The court, however, submitted that question to the jury in its instructions, and such an instruction was more, we think, than the defendant had a right to ask.

3. It is also contended that the confession of the defendant was not voluntary, but the evidence clearly indicates that no persuasion, or promise, or threat induced the defendant to make it. The fact that he now claims that he made a false confession in order to save his nephew, for whom he had the greatest affection, from the consequences of the crime is a matter to be considered by the jury with all the other circumstances, but does not go to technical admissibility.

A claim of error is predicated upon the admission of certain testimony of Dr. Gale, who assisted in performing an autopsy upon the body of the deceased. After testifying to the bruises found upon Mrs. Covell's body and the discoloration upon the right side of her face, and stating that, in his opinion, the bruises occurred before death, he was asked if he had examined the discoloration upon the face. The doctor stated that he had examined it, and was then asked, "Did you form an opinion as to the cause of that?" His answer was, "Well, I had none. I had

no opinion; no. I did not understand what had caused it." He was then asked, "In your opinion what could cause that kind of discoloration, Doctor?" This question was objected to as incompetent on the ground that the witness had stated he had no opinion, and the objection was overruled and an exception allowed. The doctor answered, "Well, I suppose it was some kind of chemical irritant."

"Q. That would be possible? A. That would be possible.

"Q. Would it leave any kind of marks or bruises or discoloration? A. I believe it would.

"Q. From your examination could you determine the cause of death? A. At that time, no, sir.

"Q. Have you an opinion now as to the cause of death, from your personal examination? A. No, I have not, unless I would consider the things that have happened since that time.

"Q. What you know about the cause of death from your own examination, your own opinion? A. No, I have none.

"Q. Would it be possible, Doctor, for Ebba Covell to have come to her death by suffocation? A. I believe so.

"Q. And would that sear, or leave a mark upon her face, if death came by suffocation? A. Yes, sir.

"Q. Could you give the name of the chemical or alkali that would cause that kind of disfiguration on the face? A. Well, I suppose so, but it would have to be in the proper strength.

"Q. What could? A. Oh, I think some strong alkali probably could.

"Q. What strong alkali, Doctor? A. Well, there is ammonia, I guess, is one."

4. The objection was not well taken. The doctor testified, as will be seen, that from his examination he had no opinion as to what caused Mrs. Covell's death. He was then asked, as an expert, as to what agents might have produced the condition, and he

answered as above recited. This evidence was entirely relevant. The doctor's answer was entirely correct when he said he had formed no opinion as to what caused the death. But it was entirely competent to show by him that the conditions were such that it might have been caused by suffocation, and that ammonia or some such chemical would have produced such condition. When this was followed up by testimony that ammonia actually was used, its relevancy becomes apparent. There was no error in permitting the questions and answers objected to.

5. Error is also predicated upon the action of the court in sustaining an objection to a question asked Dr. Fred Covell. He was asked if he had not requested police protection when proposing to walk upon the streets of Bandon after the murder. The question was entirely irrelevant to the issues then being tried and was properly overruled. The evidence indicates that Dr. Covell was arrested upon suspicion of being concerned in the murder and was confined in jail pending an investigation, at the end of which he was discharged. It might well be that in the excited state of the public mind, occasioned by the terrible event, he might have felt himself in danger of personal violence, but this had no tendency to indicate any sense of guilt upon his part and its only tendency would have been to indicate that he feared violence from the excited condition of the public mind, which, events seem to have indicated, was based upon groundless suspicion. The ruling of the court was correct.

6–8. It is also claimed that there is no such evidence of malice as would constitute murder in the first degree in this case. Malice is an intent to injure another, to be established either by proof or by presumption of law. It is not usually capable of direct

proof, because it is the outcome of a mental condition; but where a homicide is shown to have been intentional and unlawful and deliberate the law will then conclusively presume malice from these facts alone. Here, if the evidence adduced by the state is to be believed, the act was planned for many days before it was committed; it was without justification; it was intentional, and it was deliberate. Expressions of hatred or ill will against the deceased, or difficulties between the deceased and the defendant, while they would be admissible, are not legally indispensable.

The charge of the court to the jury was exceedingly fair to the defendant. He had the services of able counsel, who, with a fine conception of his duty as an attorney, and under appointment of the court, contested every inch of ground upon the trial below and in this court. His zeal in the matter, which was uncompensated in a financial way, is highly to be commended. But, as shown, no substantial reason why the judgment of the lower court should be reversed appears.

The judgment, therefore, is affirmed.

AFFIRMED.