Argued January 25, affirmed February 23, rehearing denied March 29, 1927.

# STATE v. JOHN BUTCHEK.

(253 Pac. 367; 254 Pac. 805.)

**Homicide—Conviction of Murder in First Degree for Killing Wife With Ax Held not Erroneous (Or. L., § 1544).**

1. Conviction of murder in first degree of husband, who killed wife with ax, *held* not erroneous, where deliberation and premeditation, though not directly proved, could be inferred from facts proved as to hostile relations between defendant and deceased and defendant's threats, questions of fact in criminal case being for decision of jury, under Section 1544, Or. L.

**Homicide—To Convict of First Degree Murder, Deliberation, Premeditation and Malice must be Established Beyond Reasonable Doubt, Except Where Killing Occurs in Commission of Felony.**

2. Except where killing occurs in commission or attempt to commit rape, arson, burglary or robbery, deliberation, premeditation, malice and purpose to kill must be established beyond reasonable doubt to satisfaction of jury, in order to convict defendant of first degree murder.

**Homicide—In Prosecution for Wife Murder, Testimony as to Threats and Frequent Quarrels With Wife Held Admissible to Prove Premeditation.**

3. In prosecution for murder, testimony that defendant threatened wife, whom he killed with ax, and had frequent quarrels with her *held* admissible to establish deliberation and premeditated intent to take her life.

**Criminal Law—Confession to Police Officers, Uninfluenced by Fear, Violence or Hope of Reward, That Defendant Killed Wife With Ax Held Admissible (Or. L., § 1537).**

4. Where defendant went to police station and admitted of his own accord that he killed wife with ax, with understanding that no promises or inducements were held out, confession was admissible as voluntary, under Section 1537, Or. L.

**Criminal Law—Where Defendant, Accused of Murder, was Given Opportunity in Due Time to Consult With Counsel, Failure to Do so was not Violation of Constitutional Guarantee (Const., Art. I, § 11).**

5. In prosecution for murder, defendant's right to counsel, guaranteed by Constitution, Article I, Section 11, *held* not violated by defendant's failure to obtain counsel, where right to consult with attorney was accorded him in due time, as constitutional guarantee does not require that defendant be represented by counsel.

**Criminal Law—Constitutional Guarantee of Right to be Represented by Counsel may be Waived (Const., Art. I, § 11).**

6. Constitutional guarantee to defendant, accused of crime, of right to be heard by himself and counsel, under Constitution, Article I, Section 11, may be waived by defendant, as Constitution does not force counsel upon him.

**Criminal Law—District Attorney and Police Officer Held not Magistrates Required to Inform Defendant, Confessing Murder, of Right to Counsel (Or. L., §§ 1752, 1772).**

7. In prosecution for murder, district attorney and police officer to whom defendant made confession were not required to inform him of charge against him and of his right to counsel, under Section 1772, Or. L., providing, when accused has been arrested and brought before magistrate pursuant to provisions of Section 1752, magistrate must inform him of charge and of right to counsel, as neither district attorney nor police officer is magistrate.

**Criminal Law—Death Penalty by Hanging for Murder in First Degree Held not "Cruel and Unusual Punishment" (Const., Art. I, § 37 [see Laws 1921, p. 6]).**

8. Death penalty by hanging, as punishment for murder in first degree, is not cruel and unusual punishment within meaning of Constitution, such penalty being provided for by Constitution, Article I, Section 37 (see Laws 1921, p. 6).

**Homicide—Denying New Trial, After Conviction of Murder, for Newly Discovered Evidence of Insanity Held not Error, Where Evidence as to Insanity was Controverted (Or. L., § 1527).**

9. After conviction of first degree murder, overruling motion for new trial on ground of newly discovered evidence *held* not abuse of discretion, where evidence introduced as to defendant's insanity in support of motion was controverted, in view of Section 1527, Or. L., under which every man is presumed to be sane until he establishes his insanity beyond reasonable doubt.

**Criminal Law—Test of Criminal Responsibility is Power to Discriminate Between Right and Wrong.**

10. Test of criminal responsibility is power of person who committed crime to discriminate between right and wrong.

---

6. Right of defendant in criminal case to be represented by counsel, see note in 5 L. R. A. 832. See, also, 8 R. C. L. 83.

10. See 8 R. C. L. 64.

**Criminal Law—Jealous Frenzy in Mind, Unimpaired by Disease or Heredity, is not "Insanity."**

11. Frenzy arising from jealousy in mind, unimpaired by disease and not unbalanced by heredity, is not "insanity," within meaning of Code.

## ON PETITION FOR REHEARING.

**Homicide—In First Degree Murder, Deliberation and Premeditation are Necessary.**

12. In order to constitute murder in first degree, there must be deliberation and premeditation of design to kill.

**Homicide—Premeditation in First Degree Murder may be Established by Circumstantial Evidence.**

13. In trial for first degree murder, premeditation, being a mental condition not subject to direct proof, may be established by circumstantial evidence, such as act, conduct and language of accused, character of weapon used and nature and number of wounds inflicted.

**Homicide—Presumption of Unlawful Intent and Intent of Ordinary Consequences Held Applicable in First Degree Murder Case, Where Defendant Beat Wife With Ax (Or. L., § 799, subds. 1–3).**

14. Section 799, subdivision 1–3, Or. L., creating the presumption that unlawful act was done with unlawful intent, and that person intends ordinary consequences of his voluntary act, *held* applicable, where defendant in first degree murder case beat wife over head with ax.

**Homicide—Deliberation in First Degree Murder Need not Continue for Any Fixed Time.**

15. In order to constitute first degree murder, it is not necessary that deliberation upon design to kill continue for any fixed time; it is sufficient if jury finds that there was, in fact, deliberation.

**Homicide—Deliberation and Premeditation in First Degree Murder is Always Jury Question.**

16. In first degree murder case, the existence of deliberation and premeditation is always a question for jury.

Criminal Law, 16 C. J., p. 81, n. 53, 63, p. 534, n. 37, p. 536, n. 62, p. 100, n. 12, p. 104, n. 29, p. 324, n. 62, p. 537, n. 6, p. 717, n. 39, p. 734, n. 20, p. 820, n. 12, 13, p. 821, n. 23, 25, p. 922, n. 3, p. 1182, n. 88, p. 1357, n. 35; 17 C. J., p. 252, n. 17.

Homicide, 29 C. J., p. 1105, n. 40, p. 1108, n. 73, p. 1111, n. 6, p. 1113, n. 34, p. 1114, n. 40, p. 1115, n. 45; 30 C. J., p. 142, n. 82, p. 151, n. 33, p. 153, n. 50, p. 157, n. 16, p. 293, n. 82, 83, 85, 89, 91, 92, p. 294, n. 96, p. 313, n. 42, p. 314, n. 44, p. 325, n. 77.

15. Deliberation necessary to constitute first degree murder, see note in 18 Am. Dec. 774; 38 L. R. A. (N. S.) 1058. See, also, 13 R. C. L. 767.

From Multnomah: WALTER H. EVANS, Judge.

In Banc.

This is an appeal from a judgment of conviction of the crime of murder. On appeal, the defendant asserts that the court erred in making certain rulings relating to the reception of evidence. He asserts that the punishment is cruel and inhuman, and that there is no evidence of deliberate and premeditated malice as averred in the indictment; that the jury did not base its verdict upon the evidence; that, in arriving at the verdict, it neither followed the instructions of the court nor obeyed the law; and that the court erred in overruling the defendant's motion for a new trial.          AFFIRMED. REHEARING DENIED.

For appellant there was a brief and oral argument by *Mr. Edward L. Fraley.*

For respondent there was a brief over the names of *Mr. Stanley Myers,* District Attorney, *Mr. J. L. Hammersly,* Chief Deputy, District Attorney, and *Mr. George Mowry* and *Mr. C. W. Kirk,* Deputies District Attorney, with oral arguments by *Mr. Mowry* and *Mr. Kirk.*

BROWN, J.—Prior to January 14, 1926, the defendant and his wife, Elizabeth Butchek, resided at 440 Benton Street, Portland, Multnomah County, Oregon. About 11:45 A. M. of that day, the defendant walked into the Portland Police Station and, addressing one of the Portland police officers, said: "I have killed my wife." The officer asked: "With what?" The defendant answered: "With an ax." This statement was made in the presence of Police

Inspector Theodore Schulpius, Captain Moore and Inspector Craddock. The defendant then told the officials that the body of his wife was at their home, and, a few minutes later, Police Inspector Schulpius, accompanied by a retired police officer, rushed to the scene of the alleged homicide. The house was securely locked, but Officer Schulpius, reaching in through a broken window, unlocked the window on the inside and gained entrance into the house. He found the body of Elizabeth Butchek lying on the left side, her face in a pool of blood, and about four feet from her body lay a camping ax. Under the bed, he found a pair of bloody slippers belonging to the defendant. He testified that the top of the dead woman's head had been crushed in, but that it was hard to say how many wounds had been inflicted "on account of the condition of the body being all covered with blood." He testified that the furniture was in place, and that nothing in the house gave any indication of a struggle between the defendant and his wife. The officer remained at the house until the coroner came and took charge of the body.

Coroner Ross testified that, when he reached the scene of the homicide, the body of Mrs. Butchek was lying on the floor in the corner of a room at the foot of the stairs, with her face "in a large amount of blood." Concerning the wounds upon the body, he testified:

"There was from the forehead about possibly a couple of inches above the eyes, clear over the top of the head, and down almost to the neck and back—I think I counted 14 separate cuts from the ax."

Dr. Frank E. Menne, coroner's physician, performed an autopsy upon the body of the woman. As to the condition of the body, he testified:

121 Or.—10

"I found in the scalp tissue, that is, over the right side of the head, beginning shortly above the eye, and extending to the neck, eight distinct cuts. These were, roughly, V-shaped or angular, and, as far as I remember, were all to the right of midline, and the skull was crushed and broken and small pieces of the brain were seen in some of these wounds. On the shoulders and on the hands there were purplish and blue and black bruises. The skin was not broken. These were deep bruises."

He testified that, from all indications, the wounds had been inflicted by some blunt but cutting-edged instrument, and that they were sufficient to produce death.

Inspector Schulpius testified that, when he returned to the police station from the scene of the homicide at about 12:30 P. M., the defendant was making a statement in response to questions of Deputy District Attorney Hammersly, in which he identified the hand ax marked "Exhibit A" as the ax with which he killed his wife. The officer testified:

"Q. What, if any, statement did he make about any quarrel or argument that he had had with his wife, as to whether there had been a quarrel or not? A. There had been.

"Q. Did he make any statement about her having made any attack upon him? A. He did.

"Q. What did he say about that? A. He said that she first attacked him with the broom and had hit him over the hand and wrist and he had taken the broom away from her, but later she went and got the ax and he took it away from her and, in turn, killed her with it.

"Q. Did he make any statement in regard to any previous difficulty that he had had with his wife? A. Yes, sir.

"Q. What did he say about that? A. About July of last year, he had had some argument with his wife,

and at that time he had blacked her eyes and she was in bed for three days."

As to the statement made by the defendant in answer to questions asked by the representative of the district attorney's office, the record discloses the following:

"I am J. L. Hammersly, the chief deputy in the District Attorney's office. I am advised that you came up here at a quarter to twelve, to the Detective Department, and told the Detective Department that you had killed your wife. A. Yes, sir.

"Q. Are you willing to state the circumstances of this killing to us people (Chief of Police, Court Reporter, and others) here? A. Yes, sir.

"Q. Do you realize that any statement that you may make here concerning this killing that would incriminate you could be used against you in the event you are prosecuted for this? A. Yes, sir, if I am the cause of it.

"Q. Are you willing to make this statement freely and voluntarily? A. Yes, sir.

"Q. With the understanding that no promises or inducements are being held out to you by the District Attorney's office or the Detective Department or the chief of police or anyone else? Do you understand that? We are holding out no inducements to you. You are making this statement of your own accord. A. Yes, sir. Could a fellow have an attorney? I have a few dollars in the bank.

"Q. That is not for this time. The question now is whether or not you are willing to make a statement to these people. A. Yes, sir.

"Q. How old are you? A. Forty-five. I will be forty-six in May. * *

"Q. Where were you born? A. In Hungary, Austria-Hungary.

"Q. What is your occupation? A. A molder."

Referring to his wife, he stated:

"I told her: 'Go ahead. If you want to live with that man, go ahead, but I don't have to get out of Portland.' * *

"I told the boy (one of the children) to get out of the place * * because he was making the trouble. He told me if I think that is the cause of it he will go. That happened last week.

"Q. Tell us what happened this morning. A. She started fussing. She said I just came down to fuss.

"Q. What did you tell her? A. I told her she was a liar. * * I told her she was going crazy about that guy and if she wanted to go she should go. I told her that, not once, but fifty times. I told her that, if she wanted to go, she should go. * * She was in the front room, cleaning up. * * I believe she was starting getting half crazy. * * She was trying to get me out of the place. * * She * * got the broom and started hitting me. * * I took the broom away and got her by the throat. Then I let her alone. She went upstairs and she came down, and I think she had the hatchet. * * I was in the room. I thought, 'What the hell she was going to do with the hatchet.' I said: 'What are you going to do with the hatchet?' and she started after me and * * I grabbed her * * . There is a hall and steps going upstairs. I got her in there and got the hatchet away and I started hitting her and killed her.

"Q. Where did you hit her? A. On the head.

"Q. Were you mad at the time you hit her? A. I was mad.

"Q. Didn't you know if you killed her you would be arrested? A. I know that. * *

"Q. Did you know you would be punished for killing a person? A. I know.

"Q. Did you realize that it is wrong to take the life of another? A. I know it. I told her she should let me go, she could go and stay with that man. * *

"Q. Where did you strike her with the hatchet? A. On her head. * *

"Q. Did she die right there? A. I hit her several times and she fell down."

He stated that, when he went on a trip to Aberdeen his wife accompanied him to the depot and said good-by. He further stated:

"Then she went out with that guy. I thought there must be something wrong between her and him, so I told the boys (fellow workmen): 'I am going home. I believe my wife is going out with another man'; * * and I told the boys: 'I will be back single.' "

According to his statement, he then returned from Aberdeen to Portland.

On the trial the defendant testified about the commencement of the trouble with his wife as follows:

"While we was living up there the trouble started. She got acquainted with a fellow by the name of Shelton. He is a brakeman on the Southern Pacific. She was going out with him. * * I didn't caught them, but I know she was going out. * * The trouble I had with her was all about him. * * I don't know what is wrong with my wife. Something is wrong with her. She is fussing with me."

He then testified about finding three letters that had been addressed to his wife, and that she "thought it was just a joke, but it didn't look jokey to me, the way them fellows wrote. I found them letters."

In describing a previous difficulty with his wife over the brakeman he testified that, when he brought up the subject of the brakeman to her she called him "you dirty son-of-a-bitching liar," and that "I turned around and I said bad name to her: 'Go to hell, you dirty whore.' " Then he continued:

"With both fists she hit me on the neck and I went down. I caught myself on the hands, got up, turned around, and I slapped her three times in the face. * * She was black and blue. I hit her pretty hard. * * I didn't touch her no place else but in her face. * * After that I found out them things here, that she is

going with this man, and that I heard she was giving him even money, so I took the money over. * * I went to work. I heard things, they was together again. She said: 'Why don't you ask?' I never ask anybody about my wife, * * because I know they wouldn't tell me. I know she didn't quit this man. She was still going with him * * . We was fussing several times. She told me she was going to chop my head in two with the ax, and once she told me she was going to throw something in my eyes. * * Then she told me: 'I am going to hit you so hard you won't get up any more.' * * "

Concerning another conversation relating to the brakeman, the defendant testified:

"She came up in the room and asked me: 'What is wrong?' I said: 'I believe you are going out with another man.' * * Down east I had trouble about them things. It wasn't as bad as here. * * I told her * * a dozen times, 'If you think you would better yourself, go ahead and take him. * * Go ahead and get him.' "

As to his movements after killing his wife, he testified, on direct examination:

"I looked around. She was lying on the floor. I stopped a while. I didn't know what to do. * * I was figuring how I could * * close the doors and let enough gas out so I would be dead when the children come home. * * The boy has a little dog. I went down in the basement, looked for the dog. * * So then I looked,—she had $5 the night before. I know she had a five-dollar bill and some change. I looked for that five-dollar bill but I couldn't find the five dollars either. * * Her feet was laying to the door, was close to the door so I couldn't get out, so I took her and turned her around, her feet, to get out of the way so I could get out. * * After I done that I walked down across the Broadway Bridge * * until I got here to that little barber shop * * between Third and Fourth on Salmon * * . I went in there.

I set down, didn't say nothing. I had my hair cut and shaved. I had a ten-dollar bill, gave him the ten dollars, he cashed the ten dollars and took out seventy-five cents. * * I didn't know what to do, * * and I thought, 'Well, I am going down to the police station.' * * I walked down until I got to the police station. I went in. There was an old man came up and asked me what I wanted, and I believe I told him I killed my wife. Kind of not loud enough. The man asked me again: 'What is it?' So I say to him: 'I killed my wife.' "

On cross-examination he testified:

"I didn't want to run away. * * I thought, 'They would get me anyhow, so there is no use to go away.' "

1, 2. The defendant asserts that his conviction of murder in the first degree is erroneous because of the absence of all evidence of deliberate and premeditated malice. Except where the killing occurs in the commission, or attempt to commit, any rape, arson, robbery, or burglary, deliberation, premeditation, malice and purpose to kill are essential elements in the crime of murder in the first degree, and the existence of each of these necessary ingredients must be established to the satisfaction of the trial jury beyond a reasonable doubt. In the cause at issue, it is admitted that the court charged the jury clearly and with much care concerning the elements necessary to constitute the different degrees of homicide. All questions of fact in a criminal case must be decided by the jury: Or. L., § 1544. Direct proof of deliberation and premeditation is not necessary, but may be inferred from facts proved: *State* v. *Ah Lee,* 8 Or. 214; *State* v. *Morey,* 25 Or. 241 (35 Pac. 655, 36 Pac. 573).

3. The nature of the homicide in this case, the testimony of threats by the accused against the deceased and of the frequent quarrels between them, shows motive for the crime. Therefore, this testimony is admissible as evidence for the purpose of establishing deliberate and premeditated intent to take life: Underhill's Criminal Evidence (3 ed.), § 514; Wharton on Homicide, 155.

4. According to the record, the defendant, uninfluenced by fear, duress, violence or hope of benefit arising from external pressure, walked into the Portland police station and voluntarily confessed to the slaying of his wife by killing her with an ax. The confession made to the police officers and repeated to the deputy district attorney was admissible as voluntary: Or. L., § 1537; *State* v. *Scott,* 63 Or. 444 (128 Pac. 441); *State* v. *McPherson,* 70 Or. 371 (141 Pac. 1018); *State* v. *Wilder,* 98 Or. 130 (193 Pac. 444); *State* v. *Stevenson,* 98 Or. 285 (193 Pac. 1030). Moreover, defendant took the witness-stand in his own behalf on the trial and testified to the state of facts previously related to the district attorney and the police officers.

In the case of *State* v. *Hatcher,* 29 Or. 309 (44 Pac. 584), the court erroneously admitted as evidence the preliminary statement made by the accused on a criminal prosecution, but, on appeal, this error was held to be harmless for the reason that the defendant took the stand and testified to a like statement of facts. However, in the case at bar there was no error committed.

5–7. Defendant asserts that his right to counsel, as guaranteed by Section 11, Article I, Oregon Constitution, was violated, and that he could not lawfully waive his right to be represented by counsel in the trial of the case or at any point of the investigation

by the state. In this the defendant is in error. The Constitution guarantees to a defendant the right to be heard by himself and counsel, but it does not force counsel upon him. For a general discussion of this right, see 16 C. J. 821; 12 Cyc. 533; 5 L. R. A. 832, note; 8 R. C. L. 83; Cooley's Constitutional Limitation (6 ed.), 403. A defendant may lawfully waive the benefit of counsel upon his trial, or at any point of the preliminary investigations. This defendant had a right to the aid of counsel and the further right to consult with his counsel, and that right was accorded him in due time. Hence the constitutional guaranty was not offended. An aid to the enforcement of the above constitutional provision is found in Section 1772, Or. L., which provides that, when the accused has been arrested, charged with crime, and is brought before the magistrate pursuant to the provisions of Section 1752, Or. L., the magistrate must immediately inform him of the charge against him and of his right to counsel. Neither the district attorney nor the police officer in this case is a magistrate.

8. Now, as to the next contention: The execution of the death penalty by hanging, as a punishment for murder in its highest degree, is not cruel and unusual, within the meaning of the Constitution: *State* v. *Anderson,* 10 Or. 448, 465; *State* v. *Finch,* 54 Or. 482, 496 (103 Pac. 505), and cases cited; *Wilkerson* v. *Utah,* 99 U. S. 130 (25 L. Ed. 345). Section 37, Article I, Or. Const., was adopted by the people at the general election held May 21, 1920. That section provides:

"The penalty for murder in the first degree shall be death, except when the trial jury shall in its verdict recommend life imprisonment, in which case the pen-

alty shall be life imprisonment." Gen. Laws of Oregon 1921, p. 6.

See, also, *State* v. *Evans,* 109 Or. 503 (221 Pac. 822); *State* v. *Hecker,* 109 Or. 520 (221 Pac. 808).

9–11. The defendant assigns as error the overruling of his motion for a new trial, "and particularly upon the grounds of newly discovered evidence." In support of his motion, he filed a written opinion by Dr. A. E. Tamiesie, an eminent alienist, to the effect that Butchek was laboring under the mental delusion that his wife had been unfaithful to him, "and that his normal judgment would be impaired with reference to his knowledge of right and wrong." In opposition thereto, the state filed a written opinion by another eminent alienist, controverting the showing made by defendant. In this jurisdiction, the law presumes every man to be sane until he establishes his insanity beyond a reasonable doubt: Or. L., § 1527. The test of criminal responsibility adopted in this state is the power to discriminate between right and wrong: *State* v. *Murray,* 11 Or. 413 (5 Pac. 55). A frenzy arising from jealousy, in a mind unimpaired by disease and not unbalanced by heredity, is not insanity, within the meaning of the Code: *State* v. *Lauth,* 46 Or. 342 (80 Pac. 660, 114 Am. St. Rep. 873).

The defendant's case has been presented to this court with commendable earnestness and skill. We fully realize the gravity of the case at bar. However, after a careful study of the facts and the law applicable thereto, we are of opinion that the trial court exercised a reasonable discretion in overruling defendant's motion for a new trial: *State* v. *Mims,* 36 Or. 315 (61 Pac. 888); *State* v. *Evans,* 98 Or. 214 (192

Pac. 1062, 193 Pac. 927), and the local citations there noted.

This case must be affirmed.                AFFIRMED.

McBRIDE and BELT, JJ., not sitting.

———————

Rehearing denied March 29, 1927.

ON PETITION FOR REHEARING.

(254 Pac. 805.)

REHEARING DENIED.

For the petition, *Mr. Edward L. Fraley.*

*Contra,* no appearance.

BROWN, J.—In his petition for rehearing, defendant renews his former assignments of error. These assignments were treated in the original opinion. However, owing to the gravity of the case, we will notice his assertion of the absence of proof of deliberation and premeditation, and that "the evidence is all to the effect that there was no intention, no deliberation, no premeditation." For a statement of the facts, see our former opinion. The evidence shows that the defendant committed an atrocious homicide. He seems to have been angered with his wife because of his suspicion that she was false to her marriage vows, and, on previous occasions, had accused her of criminal intimacy with another, quarreled with her, threatened her, and assaulted her. On the morning of the homicide, according to his own story, he called her a liar. She answered him with a broom, which he took from her, and she then picked up the hand ax. This he also wrested from her and, when she was

fully disarmed, he rained blow after blow upon her head and neck with the hand ax until she fell to the floor bleeding and dying. Soon thereafter he left the house, but, before going, searched the premises for a five-dollar bill that his wife had possessed the night previous.

12–14. The indictment in this case alleges a specific purpose to kill. However, in order to constitute murder in the first degree, there must also be deliberation and premeditation. But, like every other material fact arising on the trial, the formed design to kill may be established by circumstantial evidence which satisfies the minds of the jurors, beyond a reasonable doubt, of the existence of a previous purpose to kill. Here the law wisely calls to its aid in the administration of justice presumptive evidence. The trial begins with the presumption of the defendant's innocence. But, upon the proof of the commission of an unlawful act, the presumption is that such act "was done with an unlawful intent," and that the perpetrator "intends the ordinary consequences of his voluntary act." Or. L., § 799, subds. 1–3. When this defendant was intentionally beating his wife over the head with a hand ax, he was committing an unlawful act the ordinary consequence of which is death.

The existence of deliberate and premeditated malice in the killer's mind is the result of a mental condition and is not subject to direct proof. For this reason its existence may be inferred from the tangible facts in evidence: 2 Bishop's Criminal Law, p. 511; Underhill on Criminal Evidence (3 ed.), p. 709. As supporting this doctrine, see Wharton on Homicide, § 150; 2 Bishop's Criminal Law, § 673; Cyclopedia of Criminal Law, Brill, 1076; 30 C. J. 142, 143,—where it is held that deliberation and premeditation may be

inferred as a matter of fact from the circumstances, act, conduct, language, the character of the weapon used, and the nature and number of wounds inflicted.

15. Neither is the question, How long did the defendant deliberate upon a premeditated design to kill, before the execution of the mortal strokes with the ax? but, Did he deliberate at all? *State* v. *Ah Mook,* 12 Nev. 369. The law does not attempt to fix a limit to the time which must elapse between the formation of the purpose to kill and its execution, in order to admit of a finding of the elements of premeditation and deliberation necessary to a conviction of murder in the first degree. Where a homicide has been preceded by a concurrence of design with an intention to kill formed in cool blood, and these are followed by deliberation and premeditation, "although they follow as instantaneously as successive thoughts can follow each other the perpetrator may be guilty of murder in the first degree." *Aszman* v. *State,* 123 Ind. 352 (24 N. E. 123, 8 L. R. A. 33). To similar effect, see *People* v. *Sanchez,* 24 Cal. 17; *Mitchum* v. *State,* 11 Ga. 615; *State* v. *Dennison,* 44 La. Ann. 135 (10 South. 599); *King* v. *State,* 68 Ark. 572 (60 S. W. 951, 82 Am. St. Rep. 307); *Allen* v. *United States,* 164 U. S. 492 (41 L. Ed. 528, 17 Sup. Ct. Rep. 154); Wharton on Homicide (3 ed.), p. 167. On this point, note the following instructive excerpt from Wharton on Homicide, Section 115:

"It is as much premeditation if it (the intent to kill) enter into the mind of the guilty agent a moment before the act, as if it entered ten years before. And the reason of this is obvious. In the first place, if, in order to make murder in the first degree, it be necessary the idea should be proved to have been conceived a week or a day ahead, there will be no murder in the first degree at all, for the guilty party will take

care that the conception be concealed until the limitation is past. * * If the killing was not the instant effect of impulse; if there was hesitation or doubt to be overcome, a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder.''

In further elucidation of the foregoing subject, see valuable note to *Whiteford* v. *Commonwealth*, 18 Am. Dec. 771, where Freeman says:

''It is the uniform language of the cases that deliberation and premeditation for a moment, as well as for a week or a year, will render an intentional killing murder in the first degree.''

In support of this statement, the annotator cites many cases.

In the case of *Commonwealth* v. *Tucker*, 189 Mass. 457 (76 N. E. 127, 7 L. R. A. (N. S.) 1056), we find an interesting discussion of the phrase ''deliberately premeditated malice aforethought'' by the Supreme Court of Massachusetts, which, we believe, affords much help in arriving at the real meaning of that term. From the opinion of that court, we quote:

''Perhaps the most concise definition of this phrase is found in the charge in *Commonwealth* v. *Piper* (See State Ed. 920), tried in January, 1876, before Lord and Colt, J. J. The former, in speaking of the time said to the jury: 'What is necessary is, that the person shall intend to kill, he shall unlawfully intend to kill, and he shall kill in pursuance of a purpose which he has formed previously to his putting it into execution. Where the word and the blow come together it is not deliberately premeditated malice aforethought; but, where the purpose is resolved upon and the mind determined to do it before the blow is struck, then it is, within the meaning of the law, deliberately premeditated malice aforethought.' ''

16. The question of deliberation and premeditation is always one for the jury. Following a full and complete instruction as to its duty in the premises, the jury in this case found that the defendant purposely and of deliberate and premeditated malice killed Elizabeth Butchek. That verdict is based upon a sufficiency of evidence, and, as a matter of law, should stand.

The petition is denied.   REHEARING DENIED.