Argued at Pendleton October 28; affirmed December 20, 1946;
rehearing denied February 7, 1947

## STATE *v.* OGILVIE
(175 P. (2d) 454)

*Boon Cason,* of Portland, and *Charles R. Cater,* of La Grande, for appellant.

*George L. Anderson, Jr.,* District Attorney, and *Colon R. Eberhard,* former District Attorney pro tem., of La Grande (with George T. Cochran, of La Grande, on brief), for respondent.

Before BELT, Chief Justice, and BAILEY, LUSK, BRAND and HAY, Justices.

BAILEY, J. The grand jury of Union County, Oregon, returned an indictment accusing defendant Claude N. Ogilvie of the crime of murder in the first degree committed on the 25th day of July, 1945, by "wilfully, feloniously and unlawfully, purposely and of deliberate and premeditated malice" killing "one Jack Stareo by shooting him, the said Jack Stareo, with a loaded shotgun". Defendant was found guilty of murder in the first degree with a recommendation that his punishment be fixed at life imprisonment. From the judgment sentencing him to life imprisonment in the state penitentiary, defendant has appealed.

One, and the principal, contention made by the

defendant on this appeal is that there is no substantial evidence that defendant "purposely and of deliberate and premeditated malice", committed the crime with which he is charged. In determining this question it is not the province of the court to weigh the evidence or pass upon the credibility of the witnesses; that is the function of the jury.

The crime was committed about a mile and one-half south of Cove, Union county, Oregon. At the time the shooting occurred, Stareo was on land, where he resided, which he had rented from one Stackland in March, 1945. This tract of land is situate about 30 rods east of the Mill creek county road. The land immediately south of the Stackland farm is owned by the Duncans. In 1915 they granted to the defendant a twenty-foot private roadway, commonly referred to as the Ogilvie lane, across the north end of this tract of land, extending from the county road east beyond the Stackland tract. It was used by Ogilvie to reach the county road from his residence, which is more than a quarter of a mile east thereof. Both sides of this lane are fenced, the north fence being the southern boundary of the land leased by Stackland to Stareo. Early in the year 1945, the Duncans leased the land south of the lane to Stareo. In order to reach that tract of land, Stareo crossed the Ogilvie lane through gates which had been installed in the fences on each side of it.

The house in which Stareo lived is approximately 75 feet north of the north boundary of the lane. Adjoining the house at the northeast corner thereof is a wood-shed which is about ten feet farther north. The gates are almost directly south of the wood-shed. These gates are about 108 feet west of the place where the north fence of the lane is connected, at right angles, with a

fence which extends therefrom in a northerly direction and is referred to in the evidence as the intersecting fence. The post where the two fences join is referred to by the witnesses as the corner post.

There is a conflict in the evidence as to when the gates were first installed. One witness testified that they were there at the time Stareo moved onto the farm in the latter part of March, 1945. According to the defendant's testimony, Stareo, after he moved onto the farm, cut the fences and put the gates in. There is no dispute, however, that defendant several times either removed the gates entirely or nailed them up, and that Stareo as many times replaced or reopened them.

On July 5, 1945, Stareo was kicked by a horse and had seven ribs fractured. One of his lungs was punctured, causing a slight case of pneumonia. He was in the hospital until the 13th of July, and at the time of the fatal shooting he was weak and under a doctor's care. He was 57 years of age. His left arm was crippled, there being no bone in the arm from his wrist to his elbow, and he was compelled to wear a leather cushion on that arm.

About the middle of July, 1945, while defendant was removing the gates, Jacklyn Stareo, the fifteen year-old daughter of the deceased appeared and protested. She testified that the defendant told her, "You can't use those gates if I have to kill every member of your family."

We now come to the day when the shooting occurred. There is evidence to the following effect: Shortly after noon, Mr. Ogilvie drove down from his home in his farm wagon, parked it on the south side of the lane in front of the south gate and began to close up the north

gate. Stareo had been taking a nap and when he awoke, about 1:30 p. m., he observed Ogilvie at work on the fence. He left the house in his slippers and said he was going to ask Ogilvie whether he had received the district attorney's letter, which Stareo understood had been written. Stareo remained there a few minutes and on returning to the house was about to put on his shoes when Osmond W. Orton, the blacksmith, with his wife and son, drove up the lane in his automobile and stopped where Ogilvie was working. Thereupon Stareo went back and after visiting with them a while again returned to the house, put on his shoes, got a hammer, a pair of nippers, some staples, and a pail and proceeded to the intersecting fence and began to repair it in two or three places. He proceeded south along the fence until he reached the corner post where he knelt down and began to replace the old staples with new ones. In the meanwhile, Ogilvie was proceeding with removing the gate and repairing the fence. The wagon was still there but the horses had been taken to the barn by the blacksmith's son to be shod.

Ogilvie walked from the gate to the corner where Stareo was working. As he was leaving to return to his wagon, the defendant shook his finger at Stareo in a threatening manner. At least four witnesses testified to that fact. Mrs. Noyes, sister of the deceased, who had arrived from Baker about 1:30 p.m., that day, testified that she heard the defendant say, after shaking his finger at Stareo, "You're damned right I have got a gun", and saw him start for the wagon. Mrs. Stareo's testimony is substantially the same. The daughter testified that she overheard Ogilvie say to her father, after making a gesture with his hand, "I will get my gun." During the time that this

was transpiring, the daughter, the sister and Mrs. Stareo, were standing near Mrs. Noyes's automobile, which was parked to the south and near the wood-shed, approximately 150 feet from the defendant.

The defendant was within about 15 feet of Stareo when he shook his finger at him and made the above remarks. He hurried back to the wagon, got his shot-gun, which was covered with a Mackinaw or blanket, and proceeded toward Stareo. Stareo, when he saw Ogilvie with the gun, lifted himself from his kneeling position on the ground and started toward his house, holding his hands in the air and shouting, "Don't shoot". At the same time Mrs. Stareo and Mrs. Noyes were running toward Ogilvie and also shouting, "Don't shoot". Several witnesses testified that defendant fired two shots. Orton stated that defendant told him, "I shot him twice". Two empty shells were found about 20 feet west of the corner post. One shot struck Stareo in the left side of his back, killing him almost instantly. The place where he fell to the ground was approximately 45 feet from the corner and about 35 feet from Ogilvie.

The testimony of the defendant was that he had known the deceased four or five years and that he had had numerous altercations with him about Stareo cutting the lane and other fences. He admitted that when Stareo came out to see him the first time on July 25, Stareo asked him if he had received the letter from the district attorney and he told him that he had not. The letter referred to had been written by the district attorney to Ogilvie on July 17 and he stated that he received it on July 25th, after the shooting occurred.

Defendant testified that he went down to the corner to see Stareo four times. Relative to the third and fourth times, he testified as follows:

"A. I went back to the corner and told him, 'Stareo, I have asked you on two occasions, now, not to molest that fence. That is my property. He turned 'round to me, and he said, 'There is no son-of-a-bitch will stop me from going through that fence.' I said, 'What did you say?' He said, 'There is no English son of a bitch will stop me from going through that fence.' He was excited.

Q. Take it easy.

A. I answered him, 'I may be British born, but I am not a horse thief and an ex-convict like you.' His eyes flew out of his head. You could see the sparks just fly from him. I left him. I saw there was danger right there. I went back to the gate. He continued to work on that post, reaching over there with the pliers, preparing to cut the fence, as I thought. I went back on the fourth occasion, and I told him, 'Stareo, now I have asked you now three times not to molest that fence.' I said, 'If you will persist - -' He flew up, mad, stuck himself out, he said, 'If it is gun-play you want you son of a bitch, I'll give it to you.' I didn't say a word. I saw I was in danger - -.

* * *

Q. What did you do then?

A. Went back and worked on the gate.

Q. Then what happened?

A. The daughter and the mama and another woman, which I did not know, was standing at the woodshed door. I started back. Stareo he started back, in a hurry.

Q. Which way?

A. Towards the woodshed.

\* \* . \*

Q. Yes, go ahead and tell it now. Tell it just as it happened. Don't change it any.

A. I started back toward the gate. He started toward the woodshed. The daughter and the mother, and another woman which I did not recognize, was standing at the woodshed door. The daughter stepped inside the wood-shed just for a second. She came out with a gun in her hand, and hollered, 'Shoot the bastard. Shoot the son of a bitch.' I didn't know what to do. I didn't have time to think anything. The gun was laying on my wagon. I saw I was in danger. I grabbed my gun and \* \* \*

Q. Did you have any intention - - - wait until there is an objection - - - Did you have any intention of shooting Mr. Stareo, until you seen the gun in the girl's hand, and fired?'' shot Stareo. \* \* \*

An objection was made here by the district attorney and overruled by the court.

''A. Yes. Absolutely none. Never gave it a thought.''

On cross-examination the defendant testified that it was two or three minutes after he left Stareo before he shot him. He further testified as follows:

''Q. Jack has just told you that if it is gunplay you want you can have it, and you walked down, you testified, toward the gate?

A. Yes.

Q. You realized you had a gun there, then?

A. I did not, never gave it a thought.

Q. When was it that you decided you would have to use a gun?

A. After the daughter came out of the woodshed, hollering, 'Shoot the bastard; shoot the son of a bitch.'

> Q. What did she have in her hands?
> A. A gun.''

The daughter, wife and sister of the deceased denied that Ogilvie went from the gate to the corner where Stareo was more than once. They also denied that the daughter went into the shed or elsewhere and procured a gun, or that she had a gun in her possession, or that she made the outcries attributed to her by defendant.

Defendant testified that after he shot Stareo he started for his house and met Orton coming toward him. He handed the gun and loaded shells to Orton and "went down to finish repairing the gate". Soon thereafter Ray Duncan and his wife, with one or two other passengers, drove up in a car. We now quote from Ogilvie's testimony:

> "Q. They [referring to the passengers in the car] ran over immediately to assistance of the killed man, didn't they?
> A. They ran over and stood around there.
> Q. And what did you do?
> A. Kept on finishing my work at the gate.
> Q. Did you at any time go over there to succor the man, or assist him in any way?
> A. No, sir.
> Q. Did you make any inquiry as to his condition?
> A. Not until Klinghammer [deputy sheriff of Union county] came up to my barn and we had put the horses away. I said to Klinghammer, the language I used, we always call him Kling - - -
> Q. Yes.
> A. I said, 'Kling, is he dead?'
> Q. And before that you didn't find out or ascertain in any way, or make any inquiry as to his condition, dead or alive?
> A. No, sir.

Q. Well, how long did you say you were working on the gate there, before Mr. Klinghammer came, and before you went up to the barn?

A. Possibly twenty minutes—half an hour.''

The statute defines the crime of murder in the first degree to be the killing of a human being ''purposely, and of deliberate and premeditated malice''. § 23-401, O. C. L. A. In the cause before us, the court instructed the jury fully upon the various aspects of the case, and in so doing defined particularly and with care the deliberation and premeditation necessary to constitute murder in the first degree. It also pointed out clearly the elements necessary to constitute the different degrees of homicide.

■ In *State v. Morey*, 25 Or. 241, 35 P. 655, 36 P. 573, this court very aptly said:

'' * * * To constitute this crime, [murder in the first degree] it is essential that the deliberate and premeditated design to kill must precede the killing by some appreciable length of time, sufficient for reflection and consideration upon the matter, and the formation of a definite purpose to kill, and it matters not how short the time is if it is sufficient for that purpose. The rapidity of mental action is such that the formation of a design may not occupy more than a moment of time, and it is sufficient if it is formed and matured while the mind is in its normal state, and under the control of the slayer, however brief the space of time may be.''

On rehearing the court, after restating the foregoing principle, observed:

'' * * * It is therefore clear that the killing of a human being in pursuance of a deliberate and premeditated design, formed during the space of time

necessary to walk the distance mentioned in the question propounded by the jury, [from the sidewalk into the room where the shooting took place] would be murder in the first degree, and hence there was an opportunity afforded for such premeditation, if the mind of the slayer was in a condition to deliberate and premeditate. As the power to deliberate or premeditate is possessed only by those having a mind free from passion or excitement, it cannot be said, as a matter of law, that any given space of time would afford an opportunity to a given person for deliberation and premeditation, if there is any question as to whether his mind was so disqualified or disturbed. In such case the question as to whether there had been sufficient cooling time, and whether the mind was in a condition to deliberate and premeditate, would be for the jury to determine, and not the court.''

From 26 Am. Jur., Homicide, § 42, p. 186, we quote, with approval, the following:

'' * * * The law, however, will not undertake to state any limit to the time which must elapse between the formation of an intent to kill and its consummation in the homicide, in order to admit of a finding of the existence of the elements of deliberation and premeditation essential to murder in the first degree. In a word, no particular period of time is essential to deliberation. A very brief period will suffice, provided the formed intent to kill was consciously conceived in the mind of the slayer before the homicidal act was committed. * * * When a design is once formed, the haste with which it is put into execution in no way affects or modifies the degree of guilt incurred. Such design may have existed for only an instant before the commission of the crime.''

See also in this connection *State v. Butchek*, 121 Or. 141, 253 P. 367, 254 P. 805, where the matter under con-

sideration is fully discussed and many authorities cited in support of the rule enunciated in the foregoing excerpts.

■ Direct proof of deliberation and premeditation is not necessary but they may be inferred from the circumstances of the killing. *State v. Ah Lee,* 8 Or. 214; *State v. Butchek,* supra; 30 C. J., Homicide, § 351, p. 142. Malice is not usually capable of direct proof for the reason that it is the outcome of a mental condition and therefore may be inferred from the facts proved. It is the intent to injure another. When a homicide is shown to have been intentional, unlawful and deliberate, the law will then presume malice from such facts. *State v. Covell,* 113 Or. 254, 232 P. 628. "The term [malice] has often been defined as the intentional killing of one human being by another, without legal justification or excuse and under circumstances which are insufficient to reduce the crime to manslaughter." 26 Am. Jur., Homicide, § 40, p. 183.

■ Defendant attempted to prove that he killed Stareo in self-defense. He claims that he was put in fear of his life when he saw Stareo rushing toward his house and the daughter running from the wood-shed toward her father with a gun in her arms shouting to him to kill Ogilvie. Apparently the jury did not believe the defendant's testimony in this respect. It had no corroboration and was contrary to the great weight of the evidence. When the evidence is conflicting, the appellate court will presume that the jury resolved the conflict in favor of the party for whom the verdict was rendered.

■ There is substantial evidence in the record, a portion of which has been hereinbefore mentioned, from

which the jury was warranted in finding that the defendant purposely and of deliberate and premeditated malice killed Stareo.

■ Defendant's second assignment of error reads as follows: "The court erred in failing to hold that the defendant was the exclusive owner of the lane in controversy and had a legal right to maintain the fence and exclude Stareo." No adverse ruling of the court is referred to in defendant's brief relating to this assignment. The document granting a right of way to the defendant was admitted in evidence, and the court advised the jury that the defendant

> "had a right to be in and upon the real property described in this written instrument. If you should find from the testimony in this case that the deceased, Jack Stareo, was the aggressor in this fatal affray of July 25th, then the said defendant was in a place where he had a right to be, and the law would not require him to retreat from that position.
> "However, I further instruct you that even though the defendant was in a position where he had a right to be, it would not give him a right to become the aggressor and take the life of the deceased simply because he was in a place where he had a right to be."

There is no merit in this assignment.

■ It is asserted by the defendant in his third assignment of error that the "court erred in failing to poll the jury and have them answer individually as to what degree of murder they found the defendant guilty, and in pronouncing judgment of conviction of first degree murder upon such verdict." When the verdict was announced in court, the court, at the request of defendant's counsel, instructed the clerk to poll the jury. In answer to the question, "Is the verdict just read

your verdict'', each juror as his or her name was called by the clerk answered either "Yes" or "It is". No objection was made to the manner in which the jury was polled.

It is now asserted by the defendant that each juror should have been asked, "What is your verdict", and in answer to the question should have stated whether it was murder in the first degree without recommendation, murder in the first degree with recommendation, second degree murder, manslaughter, or not guilty. In support of this contention defendant relies upon the case of *Williams v. State,* 60 Md. 402, wherein the court said: "Upon the poll, it was the duty of each juror to say for himself, whether he found the prisoner guilty of *murder in the first or second degree.*" Whether the court's conclusion was based upon the statute of the state of Maryland does not appear from the opinion. In this state the method of polling a jury is provided by statute. Section 5-319, O. C. L. A., of the code of civil procedure, and made applicable by § 26-921, O. C. L. A., to criminal actions, is in part as follows: "When a verdict is given, and before it is filed, the jury may be polled on the request of either party, for which purpose each shall be asked whether it be his verdict; * * *" In the instant case the jury was polled in strict accordance with this provision. This assignment is frivolous.

The fourth and last assignment of error is thus stated: "The court erred in giving instructions number 21 and 20 since they are abstract statements of the law, and assume something in evidence that is not in the record." No exception was taken to any of the instructions given by the court. Section 5-704, O. C. L. A.,

as amended by chapter 257, Oregon Laws 1941, is in part as follows:

"No instruction given to a jury shall be subject to review upon appeal unless its error, if any, was pointed out to the judicial officer who gave it and unless a notation of an exception was made in the circuit court."

It was held in *Williams v. Ragan,* 174 Or. 328, 143 P. (2d) 209, that an instruction is not reviewable upon appeal unless excepted to by the complaining party. We have, however, read the instructions referred to and think that defendant's objections thereto are without merit.

After a careful consideration of the entire record, we are of the opinion that the defendant had a fair and impartial trial.

The judgment appealed from is therefore affirmed.