623 P.2d 630 (1981)
293 Or. 383
STATE of Oregon, Respondent,
v.
John Wayne QUINN, Appellant.
TC C 7902 30576; SC 27194.
Supreme Court of Oregon, In Banc[*].
Argued and Submitted October 16, 1980.
Decided January 20, 1981.
*631 Gary D. Babcock, Public Defender, Salem, and Thomas J. Crabtree, Deputy Public Defender, Salem, argued the cause for appellant. With them on the brief were J. Marvin Kuhn, Chief Deputy Public Defender, and Diane L. Alessi, Marianne Bottini, John Daugirda, Ernest E. Estes, David E. Groom, and Marilyn C. McManus, Deputy Public Defenders, Salem.
Thomas H. Denney, Asst. Atty. Gen., Salem, argued the cause for respondent. With him on the brief were James M. Brown, Atty. Gen., John R. McCulloch, Jr., Sol. Gen., and William F. Gary, Deputy Sol. Gen., Salem.
*632 Stephen Kanter, Cooperating Atty., Oregon ACLU Foundation, Portland, argued the cause and filed a brief as amicus curiae.
TANZER, Justice.
This is direct review pursuant to ORS 163.116(5). Defendant was charged in the alternative with intentional murder and felony murder, ORS 163.115(1)(a) and (b), and convicted of the former. He was also charged with and convicted of burglary. Defendant assigns as error the denial of his motions to suppress evidence found and seized during a warrantless search of his automobile. He also challenges the refusal to suppress his confession which he contends was involuntary and the result of the wrongful search. He also assigns as error the imposition of a sentence of death on the murder conviction.

I. SUPPRESSION
The evidence relevant to suppression was voluminous. Defendant offered evidence, but did not testify. We summarize it consistently with the trial court's findings.
Matilda Strong, an elderly crippled woman, was strangled to death and sexually abused in her apartment in southeast Portland during the night of January 16-17, 1979. Defendant was known to have spent a silver certificate for one dollar and two "wheat-back" pennies at a neighborhood grocery. These were collectors' items which police believed might have belonged to the victim. When questioned during a police canvas of the neighborhood on January 25, defendant denied any knowledge of the murder.
On February 8, a sales office in Clackamas County near southeast Portland was burglarized. Downy feathers were found on the broken window and lug sole boot prints were found below it. Two key rings and radio/stereo equipment were reported stolen. The next day, a neighbor informed the investigating officer that a green "ratty looking" car, Oregon license number LJJ 545, driven by a person named John, had been stuck in the mud on the morning of the burglary. The driver wore lug sole boots and a ripped quilted jacket which leaked feathers. The driver had left the car for about 45 minutes. Tracks existed between the broken window and the place the neighbor said the car had been.
On the afternoon of February 10 in southeast Portland, the Oregon State police officer who had investigated the burglary saw defendant driving an automobile, licensed LJJ 545, and stopped him ostensibly for a traffic violation, failing to signal before turning. Defendant had no operator's license and admitted that it was suspended (although, in fact, it was not). The officer arrested defendant for driving while his license was suspended. Standing outside the car and looking through its open doorway, the officer observed in defendant's car a radio/stereo combination which matched the description of the one stolen in the burglary two days earlier. It was jerry-rigged under the dashboard. He also saw that defendant wore lug sole boots of a size similar to the prints at the burglary.
The officer directed defendant to the police car, advised him of his constitutional rights to silence and counsel, and informed him of the evidence of burglary against him including the similarity of the radio/stereo in the car and that taken in the burglary. Defendant confessed immediately and the officer arrested him for burglary. The officer arranged for defendant's car to be towed for these reasons: 1) the police were responsible for the contents of the car, which he believed to include stolen property; 2) the car was believed to have been used in the commission of a felony; 3) the car was partially blocking the street; and 4) defendant did not object.
The officer took defendant to the Clackamas County jail where he was booked on the burglary charge. Defendant was then taken to a small room and again advised of his rights, which he said he understood. Defendant signed a card acknowledging that he understood his rights and agreed to discuss the burglary. He gave an oral statement which the officer reduced to writing. As the officer read the statement, defendant corrected several of the officer's *633 intentional errors of detail (e.g. a reference to defendant's 1968 Plymouth was changed to 1969) and he signed the statement. In it, defendant admitted taking the radio/stereo and attaching it to his car.
During this period, the officer called a Clackamas County deputy district attorney, informed him of the facts and of his intention to search defendant's car that day or the following day, and asked if a warrant should be obtained. The deputy district attorney advised the officer that a warrant was not necessary in the circumstances.
The officer's work shift had ended and he was on overtime. His police car had been assigned to another officer. He called the owner of the stolen property to arrange for him to identify it. The owner said that it would be most convenient for him to meet the officer at the auto storage lot the next afternoon. The officer then went off duty.
The following afternoon, February 12, 22 hours after the seizure, the arresting officer met the owner of the stolen property at the lot. No warrant had been obtained. The officer entered the automobile. The owner identified the radio/stereo equipment and three key rings (one unreported). One key ring was in plain view, another in the rubble on the floor and the third in the glove compartment. The officer seized the stolen items.
The officer continued to search because he believed there might be more unreported stolen property in the car. He found several brassieres and a partly opened drawstring bank bag under the front seat. (He testified it was "part way" open; the trial court found it was "open".) Reaching in the bag, he found several pairs of women's panties. He left these items in the car because they were unrelated to the burglary. He continued to search the passenger compartment and then, by going through the back seat, the trunk. He found nothing else of note and nothing more was seized.
On February 12, defendant made his initial appearance on the burglary charge in the District Court for Clackamas County. Upon his request, counsel was appointed. The lawyer inquired of various sources and learned that defendant's preliminary hearing was scheduled for February 20, but that the case was also scheduled to go to the grand jury on February 16. He first spoke with defendant by telephone on February 14 or 15 and he first met with defendant in person at his circuit court arraignment on February 22.
On February 13, Multnomah County homicide detectives were apprised of the discovery of female undergarments in defendant's car. Defendant was second on their list of suspects because he lived near the victim, had a history of burglary and had spent the silver certificate and pennies believed to have belonged to the victim.
The next day, February 14, the arresting officer and another met again with defendant in jail. The interview was tape recorded. The arresting officer advised defendant of his rights to silence and counsel. Defendant acknowledged that he understood them and was willing to talk. The officer told defendant that the radio/stereo equipment had been removed from his car. The officers also questioned defendant about several other thefts, regarding which defendant made denials and some minor admissions. They then asked his consent to search his car. After being advised that he need not do so and that anything found could be used as evidence against him, defendant signed a consent form for the search. At no time during the interview were the underwear or the homicide mentioned.
Later that afternoon, the Multnomah County homicide detectives searched the car and seized the underwear. They then met with defendant at the jail. Defendant recognized them as the police who had previously questioned him in the neighborhood about the murder. Defendant was relieved to get out of an isolation cell in which he had been kept because he had trenchmouth, a communicable disease. The detectives took him across the street to the sheriff's office and they engaged in banter along the way. Defendant was in a jovial mood. After he was advised of his rights and agreed to talk, defendant was asked if he knew the *634 reason for the visit and defendant supposed "it has something to do with January 16th." The detectives asked him about his last five burglaries. After defendant recounted four of them, one of the detectives said that defendant had omitted the Matilda Strong burglary. Defendant denied having committed it.
Defendant was then asked about the women's underclothes found in his car. He hung his head, slumped in his chair and appeared almost to cry. After not responding to the comments of the detectives for a few minutes, defendant admitted to stealing the underclothes and masturbating into them. He admitted to having been distressed and embarrassed by a sex problem, masturbation, since he was 14, particularly while at MacLaren School. He began to sob quietly.
One of the officers asked defendant if he would like some psychiatric counseling. Defendant was dubious because of an embarrassing experience at MacLaren, but said that he would like counseling.[1] He then told the detectives from where or whom he had obtained each piece of underclothing. Defendant was then asked about the Matilda Strong murder and he confessed in detail to having committed it. His demeanor during this phase of the questioning was emotional; at times he sobbed quietly and experienced difficulty breathing and speaking. A tape recorder was then used to record a repetition of the advice, waiver and confession.[2] The interview had lasted one and one-half to two hours.
Defendant is of low intelligence. His IQ as it relates to verbal skills is borderline retarded; as it relates to performance, it is higher. There is expert testimony that defendant was capable of understanding his situation and his constitutional rights as explained to him. On the recordings of his interviews by the police, his comments are quick and responsive. The trial court found that his waivers of the rights to silence and counsel on each occasion were knowingly and voluntarily made.
Each police activity in the preceding narrative is governed by principles of constitutional law. We shall examine each stage in turn.

A. The Initial Stop, Arrest and Search.
The stop and arrest of defendant on February 10 were clearly based on probable cause to believe that he had committed a crime, whether the crime be one of the traffic offenses, State v. Carter/Dawson, 287 Or. 479, 600 P.2d 873 (1979), or the burglary, State v. Cloman, 254 Or. 1, 456 P.2d 67 (1969). Defendant does not contend otherwise. The officer's observations of the stolen property were permissible, among other reasons, because they were in plain view. State v. Keller, 265 Or. 622, 510 P.2d 568 (1973).

B. Defendant's Confessions to the Burglary.
Prior to and during defendant's confessions in the police car and, the next day at the jail, the procedures required by the United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were followed. The trial court found that defendant voluntarily and knowingly waived his rights. The evidence supports the findings and we hold that they were correct. Ball v. Gladden, 250 Or. 485, 443 P.2d 621 (1968).

C. The Car Search on February 12.
The Fourth Amendment of the United States Constitution provides:
"The right of the people to be secure in their persons, houses, papers, and effects, *635 against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
Article I, section 9, of the Oregon Constitution provides:
"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."
Two fundamental principles flow from these constitutional provisions: First, all persons are to be free from unreasonable governmental searches and seizures of their persons and property. Second, as a means of protecting that freedom, the decision to search is to be made by a disinterested branch of government, the judiciary, rather than the branch which performs the search and seizure, the executive branch. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).
The requirement that there be preliminary judicial authorization for any official search or seizure is not absolute. The exigent circumstances doctrine recognizes that what is practical may also be reasonable. Therefore, as one example, an automobile, which is mobile by its very nature, may be searched and seized without a warrant if there is probable cause to believe that it contains fruit, instrumentalities or evidence of crime and if there are also exigent circumstances which make it impracticable to obtain a warrant. This exception arises from "practical necessity," State v. Greene, 285 Or. 337, 591 P.2d 1362 (1979). The existence of a practical exception, however, does not alter the fundamental principle that the decision to search is to be made by a judge, not by a police officer. That principle guides our examination of the search and seizure of the defendant's car after it was taken into police custody.
The warrantless seizure of the defendant's car at the time of his arrest was justified by exigent circumstances. The essential mobility of an automobile is not necessarily sufficient in itself to dispense with the necessity of a warrant for its seizure, State v. Fondren, 285 Or. 361, 591 P.2d 1374 (1979). Here, however, the officer had additional articulable reasons for prompt action: the car was partially blocking traffic and it appeared to contain stolen property which the police were obliged to recover and restore to the owner. These are sufficient exigent circumstances to justify the officer's decision to seize the car without a warrant by towing it to a lot subject to police control. The seizure without a warrant was lawful.
Once an automobile is taken into secure custody, the police need not refrain from searching while a warrant is sought. They may search it promptly upon the seizure without waiting for a warrant. Moreover, it is constitutionally permissible to defer the search of a seized vehicle until it is moved to police controlled premises if exigent circumstances to proceed without a warrant existed at the time of the initial seizure. We so held in State v. Greene, 285 Or. at 343, 591 P.2d at 1362, which was based upon the rationale of Chambers v. Maroney, 399 U.S. 42, 51-52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) that, for constitutional purposes, a warrantless "immediate search" of a vehicle which is seized and moved to police custody is no greater an intrusion upon the rights of the possessor than is seizing and holding the car until a warrant is obtained. The practical rule of Greene which allows the police to defer a warrantless search until the automobile is in secure police custody, however, does not allow an indefinite delay. Exigent circumstances do not last forever. The question controlling this search is whether an overnight delay is permissible.
When a person is arrested in a crime-related automobile, the police may be faced with the necessity of performing several *636 pressing tasks which cannot be performed simultaneously. The police should have some practical leeway to perform their responsibilities. In circumstances such as those before us, it is reasonable for the police to perform them in an expeditious sequence and reasonable for the court to allow it. Thus, under the rationale of Greene and Chambers, it would have been constitutionally permissible for the police to have deferred their warrantless search of defendant's car until after it was towed or until the officer had completed questioning the defendant because those are both reasonable investigative acts following the arrest. If the officer had searched the car instead of leaving at the end of his shift and returning, that would likely have been a valid warrantless search under Greene.
Here, however, the delay was not occasioned by the impracticability of searching the car immediately. Rather it was for the convenience of the police and the owner of the stolen property. If the requirement that decisions to search must be judicial is to have any effect and if the exigent circumstances doctrine is to have any temporal limitation, then a deferred warrantless search must be commenced as promptly after the seizure as is reasonable in the circumstances. This one was not. The expeditious sequence was broken, cf. Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). There was time and opportunity to seek judicial authorization  indeed the officer was ready to do so, but he understood the deputy district attorney to have advised him otherwise. The failure to have obtained a warrant invalidates the delayed search.
The finding of the underclothes violated these principles. The arresting officer's observation of the stolen radio/stereo during the course of stopping and arresting defendant was lawful. Moreover, the seizure of the affixed stolen radio/stereo in plain view for restoration to the owner was reasonable. The officer had already seized the stolen property, in which defendant had no privacy interest; he was entitled to enter the car to detach it and perfect his seizure. Extension of the search to the more private areas of the car, beneath the seats and into the glove compartment and trunk, however, was not permissible under any exception to the warrant requirement. Hence, the discovery of the women's underclothing beneath the seat violated the constitutional right of the defendant to be free from searches which are not authorized by judicial warrant.
Defendant also contends that the police were not authorized to enter the bank bag. The trial court found it to be open, but defendant characterizes it as a closed container for which a warrant is required. See State v. Downes, 285 Or. 369, 591 P.2d 1352 (1979). Our holding that the finding of the bag was unlawful makes this contention immaterial.

D. The Consent Search on February 14.
The basis for the next search of defendant's automobile and the seizure of the women's underclothes during that search is defendant's consent. The seizure of the underclothes is significant because they were used by the detectives to influence defendant to confess. We next consider whether the consent was voluntary and whether it was tainted by the preceding illegal search.
Preliminary to the questioning which terminated with the consent, defendant was again advised of his rights to silence and counsel and he waived them. Prior to giving consent, defendant was advised that he need not consent to the search of the car and that if he did, anything found could be used as evidence against him in court. During the questioning, the officers had mentioned the "tape-deck" and made a passing reference to some keys. Defendant apparently did not hear the latter comment because, as he was signing the consent, he spontaneously informed the officers that he thought he had also stolen some keys which could be found in the car. There was no mention of the underwear. Defendant knew that the cat was out of the bag in the sense that he knew that the police had discovered the stolen radio/stereo, but he was not aware of the finding of the underwear.
*637 Whether consent to search is voluntary depends upon the facts of each case. Search law differs from interrogation law at least in that the fact of lawful custody does not render involuntary an otherwise voluntary consent to search. It is relevant, but not controlling on the issue of voluntariness of consent. State v. Flores, 280 Or. 273, 570 P.2d 965 (1977); United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). This defendant's arrest was lawful, his rights to silence and counsel were respected at all times, he was advised that he need not consent and that evidence found could be used as evidence against him, and there is no suggestion in the record that his will was overborne. The trial court found from the historical facts that consent to search was knowingly and voluntarily given and we uphold that finding. Ball v. Gladden, supra, and State v. Warner, 284 Or. 147, 156-159, 585 P.2d 681 (1978). In this respect, the findings of this case satisfy the requirements for a consent search under both the majority and minority opinions in State v. Flores, supra.
An otherwise valid consent search may nevertheless be invalid if it is tainted as a result of earlier unlawful police conduct. This consent follows an unlawful search. The police knew about and sought the underwear due solely to their observations during that search. Although the underwear might not have come to light but for the earlier search, it is also true that defendant was unaware at the time he gave consent that the underwear had been found. That fact did not in any way affect defendant's decision to give or withhold his consent. The next issue, therefore, is whether unlawful police activity which leads the police to seek defendant's consent to search, but does not influence the defendant in giving that consent, taints the consent so as to require exclusion of the fruits of the consent search.
The use of evidence obtained after unlawful police conduct is regulated in Oregon by similar statutory and constitutional principles. ORS 133.683 provides:
"If a search or seizure is carried out in such a manner that things seized in the course of the search would be subject to suppression, and if as a result of such search or seizure other evidence is discovered subsequently and offered against a defendant, such evidence shall be subject to a motion to suppress unless the prosecution establishes by a preponderance of the evidence that such evidence would have been discovered by law enforcement authorities irrespective of such search or seizure, and the court finds that exclusion of such evidence is not necessary to deter violations of ORS 133.525 to 133.703."
The intention of the drafters was to codify "fairly well-established concepts," and particularly the constitutional "`fruit of the poisonous tree' doctrine first laid down in Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920)." Commentary, Proposed Criminal Procedure Code, § 167 (1972), at 106-107. This case does not involve the inevitable discovery doctrine which is incorporated into the statute, but it does involve whether evidence was discovered "as a result" of an unlawful search.
The nature of the causal relationship between unlawful police action and subsequently obtained evidence, which triggers the exclusionary rule, was considered in the leading case of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), in which the United States Supreme Court elaborated on the applicability of Silverthorne, and the "fruit of the poisonous tree" doctrine. Under Wong Sun, the influence of the illegality on defendant's exercise of will, rather than the source of police knowledge, determines whether there is taint. The facts of the case illustrate this principle. Two statements were involved in Wong Sun: one by Toy and one by Wong Sun. Government agents unlawfully entered and searched Toy's home. Toy then and there confessed that he had obtained narcotics from one Yee. The agents then went to Yee who surrendered heroin to them. Yee said he obtained it from Toy and Wong Sun. The latter two were arrested and released on recognizance. Several *638 days later, Wong Sun visited the agents. Upon being advised of his rights, Wong Sun made a statement. The United States Supreme Court required suppression of Toy's confession because it was a direct result of the agents' unlawful entry. Wong Sun's statement, however, was held admissible because it was the product of intervening events and not the product of the unlawful entry even though the police had learned of Wong Sun's involvement in a chain of events which began with the unlawful arrest.[3]
In so holding, the court rejected what might be called the "but for" test under which evidence must be excluded if any link in the chain of circumstances leading to the evidence involves unlawful police action. Were that the rule, Wong Sun's confession would have been suppressed. Rather, the dispositive consideration was whether Wong Sun's decision to make a statement was a result of the illegality or due to other factors. The court summarized its rationale:
"* * * We need not hold that all evidence is `fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is `whether granting establishment of the primary illegality, the evidence * * * has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959). * * *" 371 U.S. at 487-488, 83 S.Ct. at 417.
Here, the women's underwear might not have come to light had the officer not reached under the car seat, but when the police sought defendant's consent to search, they did not do so by exploitation of that illegal discovery. Rather, the consent was sought and given by defendant for reasons entirely distinct from that primary illegality. Applying the principles of Wong Sun, we hold that the consent was voluntarily given, uninfluenced and untainted by the earlier unlawful act. See State v. Gholston, 44 Or. App. 113, 605 P.2d 309 (1980); cf. State v. Kelgard, 40 Or. App. 205, 594 P.2d 1271 (1979).
It is arguable that in order to effectuate the Oregon Constitution, we should formulate a different rule for the exclusion of evidence assertedly tainted by unlawful police action, but this case gives no cause to go beyond the federal rule. We have held that the exclusionary rule of search and seizure should be applied only as broadly as is necessary to accomplish its protective and prophylactic purposes. State v. Nettles, 287 Or. 131, 597 P.2d 1243 (1979). See State v. Scharf, 288 Or. 451, 461 n. 10, 605 P.2d 690 (1980). The device of excluding trustworthy evidence from the factfinding process in order to serve higher purposes "is a needed, but grudgingly taken medicament; no more should be swallowed than is needed to combat the disease." Amsterdam, Search, Seizure, and Section 2255, 112 U.Pa.L.R. 378, 389 (1964). The same policy is embodied in ORS 133.683, supra, which allows such evidence if "the court finds that exclusion of such evidence is not necessary to deter violations of" the search warrant statutes. Here, the officer's unlawful discovery of the underclothes was a slight intrusion into defendant's reasonable expectation of privacy (the car was seized and defendant, in custody, knew that its contents were subject to seizure) and the officer's failure to obtain a warrant arose from a mistake of law rather than an intention to circumvent it. Neither the invasion of privacy nor the police unlawfulness in this case are of sufficient magnitude to lead us to extend exclusion under the Oregon Constitution beyond *639 that required under the United States Constitution as applied in Wong Sun.

E. Defendant's Confession to Murder.
The contention that defendant's confession is inadmissible because it was induced in part by the seizure of the underwear is answered above.
The court found defendant's waiver of rights to have been knowing and voluntary under Miranda. The findings of historical fact from the evidence support the holding and we uphold it.
Defendant next contends that even though the confession was obtained in compliance with Miranda, it was nevertheless involuntary under the traditional voluntariness cases which preceded Miranda. Statements were deemed involuntary if the court concluded from the totality of the circumstances that a defendant's will was overborne by physical or psychological pressure. If circumstances such as incommunicado custody, extended questioning, deception, defendant's limitations, or other psychological factors were sufficient in their totality to overbear a defendant's will to resist, then the resulting statement was held to be involuntary even though no physical force was used. See, for example, Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957).
This case is unlike those in both kind of magnitude. Defendant was in custody, suffered from trenchmouth, and was endowed with low but adequate intelligence. The facts of this case are markedly less favorable to defendant's contention than those in the traditional voluntary cases he cites. Moreover, a purpose of Miranda v. Arizona was to provide "protective devices" and "procedural safeguards" to eliminate the influence of such psychological factors. Those procedures were fully complied with in this case. Of course a waiver may be involuntary under the totality of the circumstances, but the findings here are otherwise. Also, we recognize that the circumstances of questioning after a voluntary waiver may become oppressive, but there are no facts to indicate that defendant had a change of heart which was overborne. We conclude that defendant's confession was voluntary in the traditional sense as well as under Miranda.
Defendant also contends that his consent to search and his confession were obtained unlawfully because counsel had been appointed on the burglary charge upon defendant's request at his initial appearance. The right to counsel belongs to an accused and it is the prerogative of the accused to assert or waive it. Moreover, for reasons we explained in State v. Singleton, 288 Or. 89, 602 P.2d 1059 (1979) and need not repeat here, an accused who once asserts his privilege may thereafter waive it. That is what this defendant did. Defendant acknowledges that Singleton is contrary to his position, but argues that we should adopt a more protective rule which absolutely bars any questioning once a lawyer is appointed or retained. We have held that a waiver of counsel may not be valid if the police have interfered with access of counsel, State v. Haynes, 288 Or. 59, 602 P.2d 272 (1979), but, in a long line of cases recounted in part in Haynes, we have rejected the absolute rule for which defendant contends. Without reploughing the same ground, we adhere to our opinions in Haynes and Singleton.

Conclusion.
From the foregoing narrative and analysis, we conclude that the trial court's denial of defendant's motion to suppress was without error and we affirm it.

II. DEATH PENALTY
Defendant raises numerous constitutional challenges to ORS 163.116 under which he was sentenced to death. We need not consider innovative constitutional theories or apply the recently formulated doctrines under which the United States Supreme Court has considered capital punishment. ORS 163.116 is defective under fundamental constitutional principles of law *640 applicable to capital and noncapital crimes alike. ORS 163.116 was drafted in apparent disregard of the amendments to Oregon's murder statutes made when there was no death penalty. Simply put, the resulting statutory scheme is a constitutionally insufficient basis for imposition of an enhanced penalty.
Capital punishment for murder in the first degree has existed intermittently in Oregon. Initially, the Oregon constitution contained no provision for a death penalty. See, C. Carey, The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857, 401-404, 448, 456 (1926). The death penalty for first degree murder was adopted by statute in 1864. Deadly, General Laws of Oregon, 1843-1872, § 516 (1874). Statutory authorization for the death penalty for first degree murder existed until 1914 when the voters abolished it by adopting a constitutional amendment which became Oregon Constitution Article I, section 36. It was restored by the voters in 1920 by a constitutional amendment which became Article I, sections 37 and 38. In 1964, the voters repealed Article I, sections 37 and 38, by adoption of Senate Joint Resolution 3. Oregon was without capital punishment from 1964 until the enactment of ORS 163.116 by initiative in the general election of 1978.
Oregon's statutory definition of murder has also changed, particularly as to the required mental state. In addition to proscribed acts (i.e., "bodily movements," ORS 161.085(1)), a statutorily specified "culpable mental state" is an element of most crimes, including murder. ORS 161.095(2) provides:
"Except as provided in ORS 161.105, a person is not guilty of an offense unless he acts with a culpable mental state with respect to each material element of the offense that necessarily requires a culpable mental state."
Differences in the requisite mental state with which criminal acts are committed may be determinative of the crime or the degree of crime of which a defendant is guilty. State v. Stockett, 278 Or. 637, 642, 565 P.2d 739 (1977). See also State v. Stilling, 285 Or. 293, 590 P.2d 1223 (1979). Obviously, the right of one accused of a crime to a trial by jury, Or.Const. Art. I, § 11, extends to all the facts which constitute that crime, including the mental element.[4]
Prior to 1971, the elements of murder under Oregon law were specified in the traditional two-degree formulation. Intentional murder was differentiated according to the requisite mental state. Second degree murder was homicide
"purposely and maliciously but without deliberation." Former ORS 163.020.
First degree murder was homicide done with a greater mental state,
"purposely and of deliberate and premeditated malice." Former ORS 163.010.
Both degrees of murder prohibited killing purposely and maliciously (i.e. intentionally). The distinction between the lower degree and the higher was solely in the requirement for first degree murder of one additional and greater element defined as deliberation and premeditation.[5]
The distinction between intentional deliberate murder and intentional nondeliberate murder may often be a fine one on the facts, but the legal distinction is nevertheless a real one of long standing under Oregon law. The term "deliberately" has often been defined. State v. McGahuey, 230 Or. 643, 646, 371 P.2d 669 (1962); see State v. Ogilvie, 180 Or. 365, 366-367, 175 P.2d 454 (1946), State v. Butchek, 121 Or. 141, 151, 159, 253 P. 367, 254 P. 805 (1927), and State v. Megorden, 49 Or. 259, 273, 276, 88 P. 306 (1907). We explained the definitional distinction under the old code in State v. Henderson, 24 Or. 100, 103, 32 P. 1030 (1893):
"To constitute murder in the first degree, it is necessary that the design to *641 take life be formed and matured in cool blood and not hastily upon the occasion: Hill's Code, § 1727. It must be the result of a deliberate and premeditated act, in pursuance of a design formed and matured when the perpetrator is master of his own understanding, and after time and opportunity for deliberate thought. But if, after the mind conceives the thought of taking life, the conception is meditated upon, and a deliberate determination formed to do the act, then, no difference how soon the fatal resolve is carried into execution, it is murder in the first degree. But when the purpose or intent to kill is formed in the midst of the conflict, and followed immediately by the act, it can be only murder in the second degree, even if the passion and provocation are not sufficient to reduce it to manslaughter, for the time and circumstances are not such as to allow deliberate thought; and yet it is the result of a formed design and purpose to kill, and the perpetrator still has left the power of controlling the operations of the mind and realizing the act he is doing, and its nature and quality and wrongfulness, and, under the instruction given by the court in this case, would be in cool blood."
The distinction historically made by this court and explained in Henderson is consistent with that applicable to the criminal law generally. It is explained in 2 Wharton's Criminal Law 181-184, § 140 (14th ed. 1979):
"Although an intent to kill, without more, may support a prosecution for common law murder, such a murder ordinarily constitutes murder in the first degree only if the intent to kill is accompanied by premeditation and deliberation.
"`Premeditation' is the process simply of thinking about a proposed killing before engaging in the homicidal conduct; and `deliberation' is the process of carefully weighing such matters as the wisdom of going ahead with the proposed killing, the manner in which the killing will be accomplished, and the consequences which may be visited upon the killer if and when apprehended. `Deliberation' is present if the thinking, i.e., the `premeditation', is being done in such a cool mental state, under such circumstances, and for such a period of time as to permit a `careful weighing' of the proposed decision." (Footnotes omitted.)
The distinction between degrees of murder based on deliberation has since been eliminated. In 1971, in the course of a comprehensive revision of the criminal code, the two-degree pattern was repealed. In its place, the legislature adopted a single form of intentional murder with a single requisite mental state. Capital punishment having been abolished, murder was made punishable by a maximum sentence of imprisonment for life. ORS 163.005 now defines criminal homicide:
"(1) A person commits criminal homicide if, without justification or excuse, he intentionally, knowingly, recklessly or with criminal negligence causes the death of another human being.
"(2) `Criminal homicide' is murder, manslaughter or criminally negligent homicide."
ORS 163.115 defines intentional murder:
"(1) * * * criminal homicide constitutes murder when:
"(a) It is committed intentionally by a person who is not under the influence of an extreme emotional disturbance; * *"
A reason for the adoption of a single form of murder with the single mental state requirement that it be done "intentionally" was that capital punishment was no longer an authorized penalty. With the abolition of capital punishment in 1964, there was no longer a need for the statutes to distinguish between those murders for which a death penalty could be imposed and those for which it could not. The drafters explained the change in their Commentary:
"* * * The principal reason for degrees of murder historically has been to permit mercy in sentencing to those defendants who have aroused the sympathy of the jury. Thus if the defendant did not premeditate * * * he cannot be held *642 for first degree murder. Where capital punishment exists this means he will not be subject to execution.
"* * * Since Oregon has no capital punishment it seems wiser to charge each simply with murder and let the judge treat each man according to his dangerousness through imposition of appropriately different sentences." Commentary, Proposed Oregon Criminal Code § 88C (1970) at 86.
The reenactment of the death penalty by initiative in the general election of 1978 is codified as ORS 163.116. In summary, the new statute, as drafted, restores deliberation as an additional element of murder for which a greater penalty, death, may be imposed much as it was under the pre-1971 statutory scheme. Although it is in the form of an enhanced penalty statute, an effect of the new statute is to indirectly reestablish a crime of deliberate first degree murder punishable by death.[6]
The novel and constitutionally impermissible provision of ORS 163.116 is that it places responsibility for fact finding as to the greater mental state with the judge, not the jury. The definition of murder in the substantive statute, ORS 163.115, is unchanged from 1971. ORS 163.116 authorizes imposition of a sentence of death upon one found guilty of murder. Subsection (1) of ORS 163.116 provides a post-trial hearing procedure before the court. Subsection (2) lists the findings which the court must consider and which, if made affirmatively, compel a death sentence under subsection (3).
"(2) Upon conclusion of the presentation of the evidence, the trial judge shall consider:
"(a) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;
"(b) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. In determining this issue, the trial judge shall consider any mitigating circumstances offered by the defendant, including, but not limited to, the defendant's age, the extent and severity of his prior criminal conduct and the extent of the mental and emotional pressure under which the defendant was acting at the time the offense was committed; and
"(c) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.
"(3) The state must prove each issue submitted beyond a reasonable doubt, and the trial judge shall render a judgment of `yes' or `no' on each issue considered."
The trial court concluded that the task of determining deliberation under ORS 163.116(2)(a) required more than a duplicative review of the jury's finding that the homicide *643 was intentional. Accordingly, the trial court found that the crime was committed with a greater culpable mental state than that found by the jury.[7] In light of the preceding discussion, that conclusion was clearly correct.[8]
We have upheld other enhanced penalty statutes even though they required additional post-trial findings by the court as a basis for a greater sentence. In particular, we have upheld the former Habitual Criminal Act and sexually dangerous offender statutes over challenges that the procedures violated the right to trial by jury of the facts upon which enhanced punishment was to be based. The difference between those statutes and ORS 163.116(2)(a), however, is found in the simple principle that the facts which constitute the crime are for the jury and those which characterize the defendant are for the sentencing court.
Our decision in State v. Hoffman, 236 Or. 98, 385 P.2d 741 (1963) illustrates the principle. There we considered post-trial habitual criminal proceedings in which the judge was to determine the existence of prior convictions and, if found, to enhance the sentence. We held that the procedure did not violate the defendant's right to a jury trial of the facts constituting the crime for which defendant was to be sentenced:
"In our opinion, the words `criminal prosecution,' as set forth in Article I, Section 11 of our constitution, refer to establishing before a jury acts declared to be criminal by legislative action. Since proof of prior crimes is not a proper matter in an indictment for a present crime, but only proof that prior punishment has not been effective to reform the person, the defendant was not entitled to a jury trial relative to his prior convictions. * * *" 236 Or. at 107, 385 P.2d at 741.
Unlike the prior convictions in Hoffman, deliberation in the act of homicide is part of an act declared by the legislature to be criminal. Because the extent of punishment is to be determined according to the existence of that proscribed fact, it must be proved at trial. See State v. Stockett, supra.
Similarly, we held in State v. Durham, 177 Or. 574, 164 P.2d 448 (1945), that a jury trial to determine prior convictions upon which an enhanced penalty was based was not constitutionally necessary because:
"It is not an offense to be an habitual criminal; it is merely a status." 177 Or. at 582, 164 P.2d at 448.
The contrast is clear: Deliberate homicide is not a status; it is an offense. If a defendant is to be punished for it, he is entitled to require the state to prove it to a jury. See also State v. Knighten, 248 Or. 465, 435 P.2d 305 (1967); State v. Custer, 240 Or. 350, 401 P.2d 402 (1965); State v. *644 Dixon, 238 Or. 121, 393 P.2d 204 (1964); State v. Ellis, 238 Or. 104, 392 P.2d 647 (1964), cert. den. 379 U.S. 981, 85 S.Ct. 686, 13 L.Ed.2d 571; State v. Hicks, 213 Or. 619, 325 P.2d 794 (1958). Accord: Graham v. West Virginia, 224 U.S. 616, 32 S.Ct. 583, 56 L.Ed. 917 (1912).
The findings required under subsection (2)(b) of ORS 163.116 are of like character to those which were upheld in the cited cases and are of the kind that may be properly considered by the court "for the purpose of determining the kind and character of a man upon whom sentence is to be imposed," State v. Hicks, 213 Or. at 630, 325 P.2d at 794. The findings under subsection (2)(a), however, go to the criminal acts for which defendant is to be punished. Unless admitted or waived, such facts must be proved to the satisfaction of a jury before the denial of life or liberty may be predicated upon it.[9] Subsection (2)(c) appears to be subject to the same analysis as (2)(a), but it is not in issue here.
Because ORS 163.116 authorizes an enhanced penalty to be imposed based upon a determination by the court of the existence of the requisite culpable mental state with which the crime was committed, a mental state different and greater than that found by the jury, imposition of a greater penalty under the statute denies to the defendant his right to trial by jury embodied in Oregon Constitution Article I, section 11 of all the facts constituting the crime for which he is in jeopardy. We express no opinion as to the validity of ORS 163.116, or any provision of it, on other grounds. The sentence of death must therefore be vacated and a new sentence imposed.
Defendant does not contend that the jury was influenced contrary to his interest by their knowledge of the possibility of a death penalty and we see no sign of such prejudice. Therefore we do not set the verdict aside.
Justice Tongue, in concurring, has taken the unusual step of petitioning the legislature in a judicial opinion. In our view, the purpose of judicial opinions is to express those ideas pertinent to the decision of the case before the court. Other forums exist for the debate of issues of judicial administration. That we decline to use these pages to respond to the concurring opinion should not be viewed as acquiescence in his premises or his use of data.
Reversed and remanded for imposition of a new sentence.
TONGUE and PETERSON, JJ., specially concur.
TONGUE, Justice, specially concurring.
I concur in the majority opinion. I believe, however, that the result reached by the majority would be better understood and accepted by the people of Oregon, who enacted the Oregon Death Penalty Act (ORS 163.116), if stated somewhat differently.
The rule that a person accused of murder is entitled to a jury trial on all of the facts necessary to prove guilt, including the required "culpable mental state," was not an invention of the Oregon courts. The Supreme Court of the United States has also held that no person shall be convicted of any crime without a trial by a jury in which the jury has found beyond a reasonable doubt the existence of every fact necessary to prove that crime.[1]
In addition, the Supreme Court of the United States, in a series of decisions, has held some state death penalty statutes to be *645 unconstitutional[2] and has held that other state death penalty statutes satisfy requirements of the Constitution of the United States.[3] In doing so that Court has stated requirements which must be as satisfied by state death penalty statutes.[4] These requirements, as stated by that court, are binding upon all state courts, including this court.
The Oregon Death Penalty Act is not a product of the Oregon Legislature. Instead, it is the product of an initiative measure submitted directly to the Oregon voters for approval. Those who drafted it for some reason chose to use as a model only a portion of the Texas state death penalty statute, which had been approved by the United States Supreme Court, but omitted other portions which that court found to be essential to its constitutionality.[5] For some reason, they also chose not to propose the measure as an amendment to the Oregon Constitution, which would have resolved any doubts as to its validity under the requirements of that constitution. Instead, the drafters of this measure prepared a measure which, in my opinion, clearly fails to satisfy requirements of the Constitution of the United States as stated by the Supreme Court of the United States.
For these reasons, I believe that the primary basis for the holding by the majority in this court that the Oregon Death Penalty Act is invalid should have been that it simply fails to satisfy requirements as stated by the Supreme Court of the United States and which are binding upon this court.
It does not follow from the decision by the majority in this case, however, that the voters of Oregon cannot adopt a death penalty statute, if they desire to do so, using as a model a state death penalty statute which has been approved by the United States Supreme Court, and if adopted as an amendment to the Oregon Constitution.
More disturbing to me has been the long delay by the majority of this court in arriving at its decision in this case  a delay which is symptomatic of the increasingly serious problem of delays by this court in its handling of appeals during the past four years. The seriousness of this problem is perhaps best exemplified by the fact that although the Chief Justice of this court announced to the press that a decision of this case was a matter of "top priority" with the court, it has been seven months since the petition was filed in this court for review of the decision by the Court of Appeals in this case and over three months since the case was heard on oral argument in this court.
The Oregon Death Penalty Act (ORS 163.116) provides:
"(5) The judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court within 60 days after certification of the entire record by the sentencing court, unless an additional period not exceeding 30 days is *646 extended by the Supreme Court for good cause. The review by the Supreme Court shall have priority over all other cases, and shall be heard in accordance with rules promulgated by the Supreme Court."
The death sentence of Quinn was entered by the Circuit Court for Multnomah County on November 21, 1979. On December 19, 1979, a notice of appeal was filed by Quinn in the Court of Appeals. On June 4, 1980, appeal was denied by it for lack of jurisdiction, based upon its decision in State v. Warren that the Court of Appeals had no jurisdiction to hear appeals under the Oregon Death Penalty Act, but that such appeals must be made directly to this court. State v. Warren, 46 Or. App. 253, 611 P.2d 342 (1980).
On June 23, 1980, a petition for review of that decision was filed in this court and was allowed on July 1, 1980. On September 4, 1980, oral argument was heard in this court on the question whether the Court of Appeals was correct in its holding that it had no jurisdiction to consider appeals under the Oregon Death Penalty Act, but that such appeals must go directly to this court. On October 15, 1980, this court affirmed that decision by the Court of Appeals.
On October 16, 1980, this court heard oral arguments on the merits of this case, including arguments on the question whether the Oregon Death Penalty Act is invalid as unconstitutional. On the same day the case was assigned to a member of the court to write a proposed opinion. It has taken an additional period of over 3 months from the date of the oral argument on October 16, 1980, for this court to decide this "top priority" case.[6]
The Standards Relating to Appellate Courts, as adopted by the American Bar Association Commission on Standards of Judicial Administration (1977), provide for Standards of Timely Disposition, including § 3.52(b)(4), which provides as follows:
"Decision. For a court sitting in panels of three judges, the average time for rendering decision should not exceed 30 days; the maximum time for any case, except one of extraordinary complexity, should not exceed 60 days. For a court sitting in larger panels, the average time should not exceed 60 days; the maximum time, except in cases of extraordinary complexity, should not exceed 90 days." (Emphasis added)
The various questions raised relating to the validity of the Oregon Death Penalty Act may or may not be such as to qualify this case as one of "extraordinary complexity."[7] It is my opinion, however, what when the people of Oregon command this court to give "priority over all other cases" to appeals under the Oregon Death Penalty Act, this court should have been able to make a decision in this case in far less than 90 days, particularly in view of the fact that members of the court are unanimous in the view that the statute is invalid. In my opinion, the people of Oregon were entitled to a more expeditious handling of this case. The defendant in this case, sitting in "death row," as well as the defendants in other cases, facing each day with the concern that they may be put to death, were also entitled to a more expeditious handling of this case.
In spite of these facts, I would not have written this opinion if this case were an *647 isolated instance of delay in decisions by this court. The unfortunate fact is, however, that this is but one of many such cases during the past four years. Indeed, the production by this court in terms of the average number of opinions per "regular" justice has steadily declined during the past four years from 41 opinions per "regular justice" in 1976, to 37 in 1977, to 32 in 1978, to 27.6 in 1979 and now to 17.6 opinions per "regular justice" in 1980.[8]
At the same time, and despite the fact that this court has written far fewer opinions during 1980 than in previous recent years, it still has been unable to satisfy the American Bar Association standard of 60 days as the "average time" for disposition of cases after oral argument, much less the ABA "maximum" of 90 days, except in cases of "extraordinary complexity."
Thus, during 1980 the average "elapsed days" from "argument to decision" was 113 days.[9] As of December 31, 1980, there were 9 cases which had been assigned to members of the court for more than 90 days for which no proposed opinions had yet been written, 2 of which had remained "unwritten" by the justice to whom they had been assigned for more than six months. Also, as of December 31, 1980, there were 18 cases which were still "under advisement" pending final decisions after more than 90 days (including the 9 "assigned but unwritten" cases) and 7 of these cases were still awaiting decisions after more than six months from the date of oral arguments.
Indeed, the operation of the court during the past four years appears to be an example of the operation of "Parkinson's Law" to the effect that the less work a bureaucratic agency has to do the more time will be required to do that work. This raises the question why this court has been unable in 1980 to decide cases more promptly now that this court is completely a court of review and can control the number of cases to be heard on oral argument requiring written opinions by controlling the number of petitions allowed or denied by it for review of decisions by the Court of Appeals.[10] In other words, an appellate court which has no control over the number of cases on which it must hear oral argument and decide by written opinion may have a good excuse for delays in decisions resulting from an increase in the volume of appeals over which it has no control. But a state supreme court which is a court of review of decisions by an intermediate appellate court and which can control the number of cases which it may choose to hear on oral argument and decide by written opinion has no good excuse for not being able to decide promptly those cases which it chooses to hear and decide.
It is true that cold statistics comparing the number of cases decided in 1980 and in previous years may be misleading and that cases accepted for decision on petitions for review are often difficult cases. On the other hand, while perhaps equally misleading, is the fact that all cases, on assignment by the Chief Justice, are rated by him as (1) "Easy," (2) "Average," (3) "Difficult," and (4) "Super-difficult." Of the 123 cases decided in 1980 by written opinions, 9 were rated as "Easy," 89 as "Average," 24 as "Difficult," and only one as "Super-difficult."
It is also true that this court worked under some handicaps in 1980. Four of its members spent time in hospitals and in subsequent recovery and one member faced a contested election. Nevertheless, of the only two members who wrote more than twenty opinions during 1980, one retired after serving for eleven months and the other was incapacitated for five weeks as the result of surgery.
The record of this court during 1980 is reminiscent of its performance 25 years ago. In 1955 this court produced 147 opinions, for an average of 21 opinions per justice. Only three members of the court *648 wrote over 20 opinions. Four members wrote from 13 to 17 opinions each.[11] In addition, the problem of delays on appeals to the Oregon Supreme Court had become so serious that the Committee on Judicial Administration of the Oregon State Bar made an investigation of the problem and published a report which included a table listing the number of opinions written by each member of the court each year.[12] A Legislative Interim Committee on Judicial Administration also made an investigation of the problem.[13] Legislation was then enacted which, among other things, extended the term of the Chief Justice from two to six years[14] and provided for appointment of retired justices and justices pro tem for use in an effort by the court to catch up with its backlog and become current in its work.[15]
By dint of hard work under the leadership of a strong Chief Justice and with the help of retired justices and justices pro tem, this court then did catch up with its backlog and became relatively current in its work, so as to become recognized as one of the most hard-working, efficient and productive of all state supreme courts. This was an enviable achievement, and one which the court was able to maintain for several years.
By 1968 it had become apparent that the volume of appeals each year was increasing at such a rapid rate as to threaten to seriously overload the capacity of the court and thus to again substantially increase the period of delay in its disposition of appeals. In response to that problem, the Court of Appeals was established on July 1, 1969.
If is of significance to note, however, that in 1968, this court's last year as a court of direct appeal, prior to the establishment in 1969 of the Court of Appeals, this court was able to decide 271 cases by written opinions by the seven regular members of the court (plus 74 opinions by pro tem judges), or an average of 38.7 opinions per regular member of the court.
In 1976, seven years after the establishment of the Court of Appeals, with jurisdiction over approximately one-half of all direct appeals, this court received 467 petitions for review. In spite of the added burden of considering and acting upon these petitions for review, this court heard 299 cases on oral argument and was able in 1976 to decide 305 cases by written opinions, including 288 by regular members of the court, plus 17 opinions by pro tem judges, and including both opinions in cases arising on petitions for review and in cases on direct appeal, for an average of 41 written opinions by each regular member of the court. By way of contrast, in 1980, after the Court of Appeals had been granted jurisdiction over the remaining one-half of all direct appeals (with some exceptions), this court received 628 petitions for review. In 1980, however, this court heard only 155 cases on oral argument and decided only 123 cases by written opinion, including both opinions in cases arising on petitions for review and in other cases, or an average of 17.6 per member of the court.[16]
It should be noted, however, that since 1976 the personnel of this court has undergone an almost complete "turnover" and only two members of the 1976 court still remain. Members of the 1976 court were also considerably older than members of the 1980 court.[17]
Nearly two years ago, in State v. Classen, 285 Or. 221, 590 P.2d 1198 (1979), I wrote a specially concurring opinion in a criminal case in which a conviction which should have been set aside was not reversed for *649 more than 8 months, despite the fact that it was not a case of "extraordinary complexity" and that the court was unanimous in reversing the conviction. At that time statistics were set forth which demonstrated both the decline in the average number of opinions written per "regular justice" for the years 1977 and 1978 and also the increase in the number of cases "under advisement," including "assigned but unwritten" cases as of December 31, 1978.[18]
In addition to expressing concern over such delays, attention was called by that concurring opinion to the fact that all Oregon trial judges are required by statute (ORS 1.050) to sign a "Certificate of Compliance" as a condition for payment of their salaries that they have no cases under advisement or undecided for more than three months "unless prevented by sickness or unavoidable casualty, or the time is extended by stipulation in writing * * *." It was noted that although the requirement of such a "Certificate of Compliance" for appellate judges would not insure action by the entire court on cases within 90 days, such a statutory requirement could require individual appellate judges to at least write proposed opinions on cases assigned to them within 90 days. At the time of that concurring opinion in State v. Classen, supra, it was proposed to the court that it voluntarily adopt by rule of court a requirement for such a "Certificate of Compliance." That proposal was rejected by the court.
In June 1980 attention was again called by dissenting opinion in State v. Beason, 289 Or. 215, 221-222, 611 P.2d 1150 (1980), to the fact that as of that date the court had made little progress toward facing and solving this problem during 1979 and during the first five months of 1980, citing statistics for that period. Further attention was called to this problem later during 1980 by special concurring opinion in Haynes v. Burks, 290 Or. 75, 619 P.2d 632 (1980), a case involving a petition for a writ of habeas corpus for denial of a speedy trial, which was not decided for over four months despite the fact that by tradition "the great writ" for the protection of the rights of persons held unlawfully in jails is to be expedited by all courts so as to grant or deny such writs in a matter of hours or days, rather than weeks or months. See also dissenting opinion in McPherson v. Employment Division, 285 Or. 541, 558, 591 P.2d 1381 (1979).
It is a distinctly unpleasant task for a member of an appellate court who has both respect and affection for each of his brethren to write such dissenting and concurring opinions. Nevertheless, as stated in Classen (285 Or. at 242, 590 P.2d 1198), as one who has long been concerned with the problem of delays on appeal to the Oregon Supreme Court,[19] I believe that my primary duty is to this court as an institution dedicated to the prompt, as well as the proper, administration of justice, in recognition of the trite, but true, proposition that "justice delayed is justice denied." Indeed, a comprehensive national survey of public attitude toward courts by the National Center for State Courts found that the public's most serious indictment is that litigation not only costs too much, but takes too long.[20]
I find myself both frustrated and saddened by the failure of this court to take *650 effective action toward a solution of what has become a problem of such a magnitude as to result in what I believe to be a partial paralysis of the effective functioning of this court as a court of justice in the sense that "justice delayed is justice denied." Despite comments to the effect that in 1979 the court was "in a period of transition"[21] and predictions by other members of the court in 1979 that it was making progress in becoming current in its work,[22] the record of the court in 1980, as previously set forth, speaks for itself.[23]
For all of these reasons, I have reluctantly come to the conclusion that the only effective means of making it clear to members of this court that the people of Oregon expect it to adopt and pursue a sense of real urgency in the disposition of its work is for the Oregon Legislature to enact a statute requiring appellate judges, as well as trial court judges, to sign "Certificates of Compliance" as a condition of payment of their monthly salary, to the effect that each appellate judge has had no case assigned to him for more than 90 days upon which he has not written and submitted to the court a proposed opinion.[24]
It may be that the adoption of such a statute would not of itself provide a complete solution to the problem and would not of itself have provided a solution to the problem of the delay in the decision of this case. It is also true that such a requirement will not insure that all cases will be decided by the court within 90 days, so as to satisfy the "standard" of the American Bar Association. This is because even after the preparation and submission by a member of the court of a proposed opinion, there may in some cases be a prolonged period of disagreement among members of the court during which dissenting or concurring opinions may be written.[25]
The problem, however, is of such a nature as to be reminiscent of the story of the farmer with a team of stubborn mules who, at the beginning of each day of work, hit each mule on the head with a club. When asked whether that did any good, his response was that "it got their attention." In other words, the mules then knew that the farmer "meant business" in his orders to them in the performance of their work each day on his farm.
The task of solving the problem of delays on appeals to the Oregon Supreme Court is not one which is subject to simple solutions. The ultimate solution will require, among other things, a change in the priorities, work habits and attitudes of members of the court. It may be said by other members of the court, and in complete good faith, that because this court is now a "law announcing" court, rather than a "case deciding" court, it would be "impossible" for them to either write many more "law making" opinions of high quality each year and equally "impossible" to do so within 90 days.
*651 This is again reminiscent of the problems of delay on appeals to this court in the 1950's when most members of this court wrote less than 20 opinions per year, including many lengthy and elaborate opinions, and when this court was far behind in its docket. Yet during the 1960's members of this court were able to change their work habits in such a manner and to such a degree as to make it possible for this court to substantially increase the number of opinions written by members of the court each year and so as also to make it possible for the court to achieve and maintain a reasonably current docket.
One of the incentives for that drastic change was a report of the Legislative Interim Committee on Judicial Administration. Included in that report was the following comment about work habits and lengthy opinions:
"Methods of work and habits of mind once established are difficult for anyone to change, harder still for those whose efficiency of action is not subject to constant review by clients, judges, partners, colleagues or employers. Evidence of this fact can, in the final analysis, come only from the court, but the fact itself is widely believed by observers among the Bar and elsewhere.
"* * *
"The function of the court is drawn in question by another frequently voiced criticism, that of the length of the court's opinions. * * * The matter is one on which there is an honest, reasonable and important difference of opinion. But in the light of the present docket problems, the view that elaborate opinions are a proper and desirable function of the court must yield to the more pressing need to decide cases as rapidly as possible. The primary function of the court is to decide cases. The function of exploring and synthesizing the law, while at times helpful, is, in the final analysis, an incidental one."[26]
Also, as previously noted, of the 123 cases decided by this court in 1980, only 24 of such cases were rated as "Difficult" and only 1 as "Super-difficult," while 89 cases were rated as "Average" and 9 as "Easy." These statistics may be somewhat misleading, as also previously noted. Nevertheless, I am of the firm opinion that while the function of "exploring and synthesizing the law" is now a more important function of the court, the need for "elaborate" or "scholarly" opinions to "explore and synthesize the law" must at least be balanced against the need for the court to decide with reasonable promptness those cases which it chooses to accept for decision if this court is to discharge what I believe to be its duty to the people of Oregon.
In effect, at least, the ABA "standard" for appellate courts of an average of 60 days from oral argument to decision, with a maximum of 90 days except in cases of "extraordinary complexity," represents such a "balance." As previously noted, the average number of days from oral arguments to decisions by this court during 1980 was 113 days.[27] Based upon my experience *652 as a member of this court for over eleven years, I am convinced that the members of this court have the ability to achieve that "standard." I am also convinced, based upon my experience, that it would impose no undue hardship upon the members of this court to require that they at least write proposed opinions in all cases within 90 days after oral argument on such cases.
The old adage that "justice delayed is justice denied" is more than trite rhetoric. These words have graphic meaning to every person who, whether willingly or unwillingly, becomes a litigant in a case on appeal to this court. These include not only persons who appeal from convictions of crimes and injured persons who have been successful in obtaining money judgments to pay for lost wages, doctor and hospital bills, and who must wait for payment until appeals are exhausted by defendants, but all persons, corporations, cities, counties and agencies of state government whose rights and ability to act have become subject to litigation and to delays on appeals to this court.
Repeated writing of dissenting and concurring opinions by a lone member of this court, calling this problem to the attention of members of the court over a period of two years, has produced no substantial results. If, however, the people of Oregon, through their legislature, adopt a statute requiring "Certificates of Compliance" by appellate judges, as well as by trial judges, as a condition of the payment of their monthly salaries, the adoption of such a statute should be sufficient, in my opinion, to "get their attention." The adoption of such a statute should also be sufficient to "get the message" to the members of this court that the people of Oregon agree with the people of other states in their indictment of the courts for the operation of a system of justice that takes too long, and that they expect this court to "get moving again" to regain its previous and hard-won, but easily lost, reputation as one of the most efficient and productive of all state supreme courts, in keeping with Oregon's long tradition of leadership in matters of government.
PETERSON, Justice, specially concurring.
Although I concur with the opinion in this case, I feel compelled to comment on part II of the court's opinion.
Article I, section 11, of the Oregon Constitution, provides:
"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury * * *."
This constitutional right exists for the protection of every person in Oregon, and no statute which limits the right to a jury trial is enforceable. The right of jury trial as to every element of a criminal prosecution is an important right  in some persons' lives, it is their most important right.
Oregon's death penalty statutes are very similar to the death penalty statutes of Texas (which were upheld in Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)), and the drafters of our death penalty statutes probably drafted the initiative with the Texas law in mind. However, the Texas law differs from the Oregon death penalty law in one very substantial particular: In Texas, after the jury finds the defendant guilty of capital murder, the *653 trial court must conduct a separate sentencing proceeding before the same jury that tried the issue of guilt. During the separate sentencing proceeding, the jury is required to answer two questions: (1) Whether the evidence established beyond a reasonable doubt that the murder of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result, and (2) whether the evidence established beyond a reasonable doubt that there was a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[1] These questions are virtually identical to those set forth in ORS 163.116(2)(a) and (b). However, under the initiative enacted by the people of Oregon in 1978, these two questions are answered by the judge, not the jury.
The opinion herein states (at 643):
"We have upheld other enhanced penalty statutes even though they required additional post-trial findings by the court as a basis for a greater sentence. In particular, we have upheld the former Habitual Criminal Act and sexually dangerous offender statutes over challenges that the procedures violated the right to trial by jury of the facts upon which enhanced punishment was to be based. The difference between those statutes and ORS 163.116(2)(b), however, is found in the simple principle that the facts which constitute the crime are for the jury and those which characterize the defendant are for the sentencing court."[2]
I was troubled, however, by the fact that the highest courts of at least five states, Nebraska, Arizona, Florida, Alabama and Ohio, and possibly the Supreme Court of the United States as well, have rejected assertions that the imposition of the death penalty by the judge, in the bifurcated post-verdict hearing, violates the defendant's right to a jury trial. After studying the decisions from those jurisdictions, I conclude that they were all decided on a basis other than the limited issue upon which the court's opinion in this case rests. In each of the five jurisdictions mentioned above, the jury, in their verdict, had found deliberateness or premeditation as part of their verdict, and the post-verdict hearing conducted by the court did not involve that element of the crime.
The Nebraska court, in State v. Simants, 197 Neb. 549, 250 N.W.2d 881 (1977), cert. den., 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158, reh. den., 434 U.S. 961, 98 S.Ct. 496, 54 L.Ed.2d 322 (1978), held that it was constitutionally permissible for the judge to impose the death penalty following a jury verdict of guilty. But the jury was required to first find that the defendant killed another person "purposely and with deliberate and premeditated malice." Section 28-303, R.R.S. (1943). Under the Nebraska law, the court then weighed eight possible aggravating circumstances and seven possible mitigating circumstances before imposition of the penalty of death.[3] Regarding the claim that this procedure violated *654 state and federal jury trial constitutional protections, the court held:
"Before we consider the procedures further, we turn to defendant's contention that the lack of jury involvement in the sentencing procedure is contrary to the due process clause of the Fourteenth Amendment to the United States Constitution as well as Article I, section 3, of the Bill of Rights, of the Constitution of the State of Nebraska. The United States Supreme Court, in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), has held that jury sentencing in a capital case is not constitutionally required. In that case the Court stated in upholding the Florida procedure: `The basic difference between the Florida system and the Georgia system is that in Florida the sentence is determined by the trial judge rather than by the jury. This (the United States Supreme) Court has pointed out that jury sentencing in a capital case can perform an important societal function, Witherspoon v. Illinois, 391 U.S. 510, 519 n. 15, 88 S.Ct. 1770, 1775, 20 L.Ed.2d 776, but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases.'
"Inferentially, Nebraska has met this contention in the application of its habitual criminal law. We have repeatedly sustained the constitutionality of that law. In Nebraska the increased punishment for a subsequent felony is a court determination and not one for a jury. See State v. Losieau, 184 Neb. 178, 166 N.W.2d 406 (1969).
"As we understand the federal and the state constitutional provisions, they do not require or even suggest that jury sentencing is constitutionally required. Whatever the relative merits of sentencing by a judge or jury may be, we need not consider them. Our concern is the constitutionality of the Nebraska system, under the federal and state Constitutions. The relative merits of the one or the other is for legislative and not judicial determination. We find the sentencing procedure provided by the Nebraska statute does not violate either the Nebraska or the federal Constitution." 250 N.W.2d at 887-888.
The Ohio Supreme Court, in State v. Weind, 50 Ohio St.2d 224, 364 N.E.2d 224 (1977), vacated 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156 (1978), reached the same conclusion.[4] In Ohio, however, the indictment must list the aggravating circumstances and the jury verdict must "separately state whether the accused is found *655 guilty * * * of each specification * * *."[5] If the accused is found guilty of one or more of the specifications, then and then only can the judge impose a sentence of death. Ohio Rev.Code Anno. § 2929.03. Moreover, the indictment charged the defendant with "purposely and with prior calculation and design" causing the death of another. In Ohio, the jury was first required to make the findings which the defendant in the case at bar claims should have been made by the jury instead of the court.
In State v. Watson, 120 Ariz. 441, 586 P.2d 1253 (1978) cert. den. 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979); Jacobs v. State, 361 So.2d 640 (Ala. 1978); and Proffitt v. State, 315 So.2d 461 (Fla. 1975) aff'd. in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), reh. den. 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 158 (1976), the courts also rejected the defendant's claim that his constitutional right to trial by jury had been violated. In all of these cases, however, the jury had already found, by their verdict, that the homicide had been deliberate or premeditated.[6]
I am convinced that the ORS 163.116 element of deliberateness is one of "the *656 facts which constitute the crime," and therefore the defendant is entitled to a jury. But while it is easy to state "the simple principle," I fear that future cases will arise which make the application of the "simple principle" difficult.[7]
NOTES
[*] Howell, J., retired November 30, 1980.
[1] The next morning, at the suggestion of a Multnomah County deputy district attorney, defendant was taken to and examined by a psychiatrist. Evidence of that examination was suppressed because the court found that defendant reasonably believed it to be for treatment rather than for forensic purposes. The correctness of that ruling is not on review.
[2] The practice of turning on a tape recorder after the critical events have occurred in order to repeat and commemorate a confession may produce evidence of interest to a jury, but it is less than helpful to the court in determining voluntariness. Indeed, failure to record an entire interrogation may make everything that precedes the recording suspect.
[3] The court also held that the heroin seized from Yee was admissible against Wong Sun, but not against Toy. The evidence was a direct result of entry of Toy's home, but the connection between that unlawful act and Wong Sun's was too "attenuated" to require exclusion. Attenuation is a relative concept applied as a matter of degree. Attenuation is material when there is a causal link between the unlawful act and the evidence. This case, however, involves independent causation rather than attenuation of the original causation because this defendant's decision to consent was not the product of unlawful police conduct, whether direct or remote.
[4] Or.Const. Art. I, § 11:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury .. ."
[5] Murder in the first degree also included killing in the course of certain felonies and other acts of homicide not material here.
[6] The Attorney General, in his brief, comes to the same conclusion. Answering a different theoretical argument, the state recognized that "deliberately" means something more than "intentionally" and essentially represents a readoption of the former two-degree statutory scheme. He states:

"* * * According to ORS 161.085(7), `intentionally' or `with intent' `means that a person acts with a conscious objective to cause the result or to engage in the conduct so described.' To kill `deliberately' or `with deliberation,' on the other hand, partially resurrects Oregon's common law and former statutory distinctions between such terms as `premeditation,' `malice aforethought,' and `purpose.' Former ORS 163.010(1) defined first degree murder as any killing done `purposely and of deliberate and premeditated malice.' Former ORS 163.020(1) defined second degree murder as a killing done `purposely [i.e., intentionally] but without deliberation and premeditation.' The inquiry prescribed by present ORS 163.116(2)(a) into whether the defendant acted not only `intentionally' but also `deliberately' thus creates the functional equivalent of both first degree (capital) and second degree (non-capital) murder and serves significantly to limit the broad class of `intentional' or `purposely' committed homicides to a narrower type of aggravated murders which become potentially subject to capital punishment. * * *"
[7] The court stated:

"In order to answer the first question, consideration must be given initially to the meaning of the word `deliberately.' Is the commission of a homicide deliberately the same as its commission intentionally? If so, the Court is bound to find that this homicide was committed deliberately because the jury has already made that decision when it found specifically that the defendant acted intentionally, and the Oregon Constitution, Article VII, Section 3 prohibits the Court from interfering with this finding of fact by the jury. In my opinion, it is intended by the use of the word deliberately to add another dimension. So in deciding the first issue I am interpreting `deliberately' to mean that the defendant must have weighed and considered the question of killing and, having in mind the consequences, made a rational decision to kill. The duration of time is not the true test but rather the extent of the reflection."
[8] In addition, it is particularly obvious that a finding that the homicide was deliberate would have required more than the jury would have found had they convicted defendant of homicide in the commission of a burglary. For that, the jury need only find the intent necessary for burglary, intent to kill is not an element of felony murder. ORS 163.115(1)(b) defines as murder criminal homicide when:

"It is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit arson in the first degree, burglary in the first degree, escape in the first degree, kidnapping in the first degree, rape in the first degree, robbery in any degree or sodomy in the first degree and in the course of and in furtherance of the crime he is committing or attempting to commit, or the immediate flight therefrom, he, or another participant if there be any, causes the death of a person other than one of the participants".
[9] The same principle is incorporated in the Due Process Clause of the United States Constitution:

"* * * `No man should be deprived of his life under the forms of law unless the jurors who try him are able, upon their consciences, to say that the evidence before them * * * is sufficient to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged.'" Davis v. United States, 160 U.S. 469, 493, 16 S.Ct. 353, 40 L.Ed. 499 (1895), quoted in In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).
[1] See, e.g., In re Winship, 397 U.S. 358, 363-64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). See also Jackson v. Virginia, 443 U.S. 307, 315-16, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
[2] Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); (Harry) Roberts v. Louisiana, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977); (Stanislaus) Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
[3] Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
[4] See, e.g., Jurek v. Texas, supra note 3, 428 U.S. at 271, 96 S.Ct. at 2956; Gregg v. Georgia, supra note 3, at 166-68; Lockett v. Ohio, supra note 2, 438 U.S. at 604, 98 S.Ct. at 2964; Woodson v. North Carolina, supra note 2, 428 U.S. at 303-05, 96 S.Ct. at 2990-91.
[5] In Jurek v. Texas, supra note 3, the Supreme Court emphasized that the Texas statute, by narrowing the categories of murders for which the death sentence may be imposed, had essentially set out aggravating circumstances of the type necessary to uphold the validity of the death penalty statutes in Gregg v. Georgia, supra note 3, and Proffitt v. Florida, supra note 3. See 428 U.S. at 270-71, 96 S.Ct. at 2955-56. No such list of aggravating circumstances or narrowing the categories of murder is found in the Oregon statute.
[6] It may be pointed out that this member of the court, the author of the opinion by the majority, then underwent surgery and was incapacitated for some time. In spite of that fact, however, and also despite the express provisions of ORS 163.116(5), requiring that such cases "shall have priority over all other cases," that member of the court then proceeded to complete opinions in two cases previously heard by the court, Springfield Ed. Assn. v. Springfield School Dist., 290 Or. 217, 621 P.2d 547 (1980), and Adams v. Psychiatric Sec. Rev. Bd., 290 Or. 273, 621 P.2d 572 (1980), and to write opinions in two cases heard subsequently by the court, Miller v. Employment Div., 290 Or. 285, 620 P.2d 1377 (1980), and Mangus v. Progress Quarries, Inc., 290 Or. 377, 622 P.2d 319 (1981), before completing a proposed opinion in this case.
[7] When cases are assigned by the Chief Justice to members of the court for the writing of opinions, they are rated by him as follows: (1) "Easy," (2) "Average," (3) "Difficult," and (4) "Super-difficult." This case was rated as "(3)," i.e., "Difficult," but not "Super-difficult."
[8] See note 18 for comparative statistics.
[9] No comparable statistics are available for previous years.
[10] See concurring opinion, State v. Classen, 285 Or. 221, 242-43, n. 12, 590 P.2d 1198 (1979).
[11] See Appendix B-2, Report of Committee on Judicial Administration, Oregon State Bar, 1956.
[12] Id.
[13] See Report of Legislative Interim Committee on Judicial Administration (1958).
[14] Or. L. 1959, ch. 384, now ORS 2.045.
[15] Or. L. 1959, ch. 44.
[16] For comparative statistics, see note 18.
[17] The average age of members of the 1976 court was approximately 65 years. The average age of the 1980 court was under 60 years.
[18] Those comparative statistics, extended to include 1979 and 1980, are as follows:

Comparative
Statistics 1976 1977 1978 1979 1980
Petitions for review 467 311 408 552 628
 received
Petitions acted 456 273 363 556 635
 upon
Oral arguments 299 344 275 136 155
 heard
Cases decided by 305 322[*] 259 193 123
 written opinion
Average number of 41 37 32 27.6 17.6
 opinions per "regular"
 justice
Cases "under advisement" 44 74 78 27 48
 as of
 December 31
Cases under advisement 32 64 74 21 35
 "assigned
 and unwritten"
 as of December
 31

[*] This included 63 opinions by pro tem justices.
[19] See Tongue, Delays on Appeal to the Oregon Supreme Court, 36 Or.L.Rev. 253 (1957).
[20] O'Neill, Judges Journal, Winter 1979, Vol. 18, No. 1, p. 7.
[21] See 1979 Annual Reports, Oregon State Bar, Report of Committee on Judicial Administration, p. 37.
[22] See statements by Denecke, C.J., as reported in Oregon Statesman March 19, 1979, and concurring opinion by Lent, J., in State v. Classen, supra n. 10, 285 Or. at 245, 590 P.2d 1198.
[23] See comparative statistics, note 18.
[24] Such a statute should include the same exception in cases of sickness or other casualty as presently provided for trial judges. The statute should become effective after some reasonable period of time to enable members of the court to write opinions on cases assigned to them for more than 90 days. The statute should also require that all cases heard on oral argument be then immediately assigned to members of the court for the writing of opinions, so as to obviate its avoidance by methods such as those used by the California Supreme Court to avoid the operation of a similar statute by not formally accepting a case until the day it is decided. Work, Calif. Probe Shows How Court Makes Rulings, Nat.L.J., July 23, 1979. Finally, although such a statute should logically extend to all Oregon appellate judges, including the Court of Appeals as well as this court, the Court of Appeals would appear to be already sufficiently current in its work so that the adoption of such a statute would impose no undue hardship upon its members.
[25] See, e.g., State v. Tourtillott, 289 Or. 835, 618 P.2d 423 (1980), and City of Klamath Falls v. Winters, 289 Or. 747, 619 P.2d 217 (1980).
[26] See Report, supra note 13, at 19-21.
[27] A request was made to the National Center for State Courts for a survey of all state supreme courts in states with intermediate courts for comparative statistics which would show, among other things, the number of cases decided by written opinions each year, with the average number of opinions written per judge each year, and the average elapsed time between oral argument and the final decision of cases.

Unfortunately, many of the courts, including the Oregon court, did not provide all of the requested statistics. Eleven of the twenty-one courts responding, however, decided more than 30 cases per judge by written opinions other than per curiam opinions for the year 1978-1979 (Alaska, Arizona, Colorado, Connecticut, Indiana, Kansas, Kentucky, Louisiana, Massachusetts, New Mexico, and Pennsylvania.) Four of such courts decided between 20 and 30 cases per judge by such written opinions (Illinois (28); Iowa (29); New York (26); and North Carolina (23)). Six of such courts decided less than 20 cases per judge by such written opinions (California (18, but with 2,970 petitions for review); Maryland (16); Michigan (18, but with 1,381 petitions for review); New Jersey (13, but with 975 petitions for review); Texas (10, but with 822 petitions for review); and Washington (17)). The Oregon Supreme Court wrote an average of 17.6 opinions per judge during 1980, with 625 petitions for review.
The comparative statistics from that survey on the average elapsed time from oral argument to decision was more fragmentary. Only six of such courts submitted statistics on that subject: Alaska (237 days); Kentucky (oral arguments every three weeks, opinions "usually ready by next sitting for oral argument"); Maryland (85 days); Massachusetts (90.7 days); New Jersey (108 days median); New Mexico (74.8 days from "submission to decision"); and New York ("4-6 weeks for 90-95% of cases"). It has been said that for the Supreme Court of the United States for the year ending December 31, 1979, the average length of time from oral argument to decision was 98 days, despite its gigantic load of petitions for certiorari and the fact that most of the cases heard by that court are cases of both importance and difficulty. See Work, supra note 24. Compare 1956 statistics from other state courts as set forth in Tongue, Delays on Appeal to the Oregon Supreme Court, 36 Or.L.Rev. 253, 268 (1957).
[1] See Tex. Code Crim. Proc. Art. 37.071 (Supp 1975-1976).
[2] The following cases hold that it is improper to impose an enhanced penalty, based upon a finding by the judge, post-verdict, where the post-verdict determination is made by the judge and relates to the criminal offense charged. State v. Ferris, 249 A.2d 523 (Me. 1969); State v. Wheeler, 252 A.2d 455 (Me. 1969); State v. Blea, 84 N.Mex. 595, 506 P.2d 339 (1973); State v. Wilkins, 88 N.Mex. 116, 537 P.2d 1012 (1975).
[3] The Nebraska statute states:

"(1) Aggravating Circumstances:
"(a) The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity;
"(b) The murder was committed in an apparent effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime;
"(c) The murder was committed for hire, or for pecuniary gain, or the defendant hired another to commit the murder for the defendant;
"(d) The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence;
"(e) At the time the murder was committed, the offender also committed another murder;
"(f) The offender knowingly created a great risk of death to at least several persons;
"(g) The victim was a law enforcement officer or a public servant having custody of the offender or another; or
"(h) The crime was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws.
"(2) Mitigating Circumstances:
"(a) The offender has no significant history of prior criminal activity;
"(b) The offender acted under unusual pressures or influences or under the domination of another person;
"(c) The crime was committed while the offender was under the influence of extreme mental or emotional disturbance;
"(d) The age of the defendant at the time of the crime;
"(e) The offender was an accomplice in the crime committed by another person and his participation was relatively minor;
"(f) The victim was a participant in the defendant's conduct or consented to the act; or
"(g) At the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental illness, mental defect, or intoxication." Neb. Rev. Stat. § 29-2523.
[4] The case was vacated due to the Supreme Court's holding in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), that the sentencing provisions of the Ohio death penalty statute violated the Eighth and Fourteenth Amendments to the United States Constitution. However, the court stated:

"In view of our holding that Lockett was not sentenced in accord with the Eighth Amendment, we need not address her contention * * that the Constitution requires that the death sentence be imposed by a jury * * *." 438 U.S. at 609 n. 16, 98 S.Ct. at 2967 n. 16.
[5] Ohio Code § 2929.04 lists the aggravating and mitigating circumstances.
[6] At the time of the court's opinion, in Arizona first degree murder was defined as follows:

"A person commits first degree murder if:
"1. Knowing that his conduct will cause death, such person causes the death of another with premeditation * * *." Ariz.Rev.Stat. Anno. § 13-1105.
The aggravating and mitigating factors in Arizona are as follows:
"F. Aggravating circumstances to be considered shall be the following:
"1. The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable.
"2. The defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person.
"3. In the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the victim of the offense.
"4. The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value.
"5. The defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value.
"6. The defendant committed the offense in an especially heinous, cruel, or depraved manner.
"7. The defendant committed the offense while in the custody of the department of corrections, a law enforcement agency or county or city jail.
"G. Mitigating circumstances shall be the following:
"1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to the constitute a defense to prosecution.
"2. The defendant was under unusual and substantial duress, although not such as to constitute a defense to prosecution.
"3. The defendant was legally accountable for the conduct of another under the provisions of § 13-303, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution.
"4. The defendant could not reasonably have foreseen that his conduct in the course of the commission of the offense for which the defendant was convicted would cause, or would create a grave risk of causing, death to another person.
"5. The defendant's age." Ariz.Rev.Stat. Anno. § 13-703.
In Florida, the murder statute under which the defendant was convicted required the jury to find that the death was "perpetrated from a premeditated design to effect the death of the person killed * * *." Fla. Stat.Anno. § 782.04(1)(a) (Supp 1976-1977). The aggravating and mitigating circumstances were:
"(a) The capital felony was committed by a person under sentence of imprisonment.
"(b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.
"(c) The defendant knowingly created a great risk of death to many persons.
"(d) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.
"(e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
"(f) The capital felony was committed for pecuniary gain.
"(g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
"(h) The capital felony was especially heinous, atrocious, or cruel." § 921.141(5) (Supp 1976-1977).
The mitigating circumstances are:
"(a) The defendant has no significant history of prior criminal activity.
"(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.
"(c) The victim was a participant in the defendant's conduct or consented to the act.
"(d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor.
"(e) The defendant acted under extreme duress or under the substantial domination of another person.
"(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
"(g) The age of the defendant at the time of the crime." § 921.141(6) (Supp 1976-1977).
In Alabama, the aggravating and mitigating circumstances are virtually identical to those in Florida. Ala. Code §§ 13-11-6, 13-11-7.
[7] For example, if our death penalty law were identical to Florida's (see footnote 6), could aggravating factors (c) through (h) properly be considered by the court rather than a jury? Would those factors be "the facts which constitute the crime"?